EDWIN D. AND SONDRA M. ABRAMSON, ET AL.,[1]
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 4524-82, 5336-82,
5622-82, 16623-82,
16624-82, 5588-83,
5854-83, 14479-83,
15578-83, 15581-83,
16213-83.

Filed March 12, 1986.

*Herbert L. Zuckerman, Robert J. Alter,* and *Felix C. Ziffer,* for the petitioners.
*Raymond J. Farrell* and *Albert Russo,* for the respondent.

WHITAKER, *Judge*: This consolidated case includes 10 different petitioners, one of which is a fiscal year corporation. Appendix A sets forth the petitioners by name and docket numbers, the tax years involved, the deficiencies for each year, the places of residence of each individual petitioner, and the principal place of business of the corporate petitioner when each petition was filed. Each of the petitions includes, among other issues, the common

---

[1]The cases of the following petitioners are consolidated herewith: Edwin D. Abramson and Sondra M. Abramson. docket Nos. 4524-82, 16213-83; Rudolph R. Cestone and Aurea P. Cestone, docket Nos. 5336-82, 16623-82; Edwin P. Stivaly and Jo Marie Stivaly, docket Nos. 5622-82, 16624-82; Charles Stanziale and Margaret Stanziale, docket Nos. 5588-83, 14479-83; Edward Sturchio and Marilyn Sturchio, docket No. 5588-83; Seymour H. Miller and Shirley S. Miller, docket No. 5854-83; John N. Tolpa and Mary Jane Tolpa, docket No. 5854-83; Estate of John Tolpa, Deceased, Mona Tolpa, Executrix, and Mona Tolpa, docket No. 5854-83; Joseph Pieretti, Jr. and Marie Pieretti, docket No. 15578-83; and Brookdale Beverage Co., Inc., docket No. 15581-83.

issue of the tax consequences of the investment by the individual general partner and by all of the limited partners in a New Jersey limited partnership known as Surhill Co. (Surhill). In the statutory notice, respondent disallowed each partner's share of the partnership losses, which included current expense and depreciation deductions. Issues related to this matter were severed and consolidated for the purposes of trial, briefing, and opinion. The issues arise out of the acquisition in 1976 and the exploitation of a movie originally entitled "Scandal" or "Scandello" and retitled "Submission" (Submission).

The issues as framed by respondent may be summarized as:

(1) Whether Surhill was organized with an intention to make a profit; and

(2) if issue (1) is decided in favor of petitioners,

(i) whether petitioners may include in basis the amount of a nonrecourse note evidencing the unpaid portion of the purchase price due the seller of Submission;

(ii) whether Surhill is entitled to an allowance for depreciation under the income forecast method for the tax year 1977;

(iii) whether the depreciation deductions claimed by Surhill for the years 1977 and 1978 were properly computed in accordance with the income forecast method; and

(iv) whether petitioners were at risk under section 465[2] for the amount of the nonnegotiable promissory note element in the purchase price by reason of a written guarantee (sometimes referred to as so-called guarantee) by the limited partners running to the seller of Submission.[3]

---

[2] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] By Pre-trial order dated Sept. 20, 1983, we stated the common issues in this case in a slightly different form which petitioners have followed in their brief although petitioners added an additional clarifying issue with respect to the application of sec. 465. The differing statements of the issues by opposing counsel vary in only two material respects. The Pre-trial order preserved for respondent the argument that the transaction was a factual sham and a specific issue as to whether or not certain expenses of the partnership which were included in the annual losses were deductible. We deem that respondent has abandoned the sham argument and, if not, we would hold against respondent on that issue as our findings of fact and opinion on issue (1) clearly indicate. Our disposition of issue (1) also determines the deductibility of business expenses claimed by the partnership in each year and, to the extent that respondent had not waived that issue by failing to argue it, we would hold against

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time of filing of the petitions, the residences of the several petitioners were as set forth in Appendix A. To the extent material with respect to the years involving the severed issues, the petitioners filed timely income tax returns, and respondent issued timely statutory notices.[4]

Surhill was formed as a limited partnership under the laws of the State of New Jersey on December 10, 1976, by Edwin D. Abramson (Abramson). He and his wholly owned corporation, Creative Film Enterprises, Inc. (Creative), were the general partners of Surhill. The remaining petitioners were limited partners, but not all of the limited partners have filed petitions with this Court with respect to the Surhill issue. Surhill was organized for the purpose of purchasing the U.S. rights to Submission. Creative was incorporated under the laws of the State of New Jersey by Abramson for the purpose of locating movies for acquisition by limited partnerships similar to Surhill and to become a general partner in such limited partnerships. The general partners together contributed $3,333 to Surhill and are entitled to 1 percent of the profit or loss. The limited partners together contributed the sum of $330,000 and are entitled to 99 percent of the profit or loss. Surhill elected to use the accrual method of accounting and files its returns on the calendar-year basis.

Abramson is a certified public accountant with offices in West Orange, New Jersey.[5] He has specialized in doing

---

respondent and allow the deductions by reason of disposition of issue (1), irrespective of our treatment of the depreciation issue.

[4]The parties have stipulated the timeliness of certain specified income tax returns and certain specified statutory notices which do not include all of the years of each of the petitioners which are included in the several petitions. Since no issue was made of untimely filed returns or untimely issued statutory notices in this case, we assume for purposes of the trial of these severed issues there is no issue as to a late filed return or an untimely statutory notice.

[5]In 1972 Abramson, with the assistance of his attorney Felix Ziffer, located a film entitled "The Last Roman" which was acquired by a limited partnership which Abramson organized. The Tax controversy between respondent, Abramson as general partner, and a number of the limited partners was decided by us in a companion consolidated case tried at the same time as this case. For convenience, certain of the testimony in the companion case was incorporated by reference herein and it is, in part, based on that incorporation by reference that we make these findings of fact with respect to Abramson and Ziffer. See *Sheid v. Commissioner*, T.C. Memo. 1985-402. Subsequent to 1972, Abramson formed Creative and continued to acquire movies through limited partnerships. Apparently, all of these limited partnerships have, to date, lost money. Respondent has argued that we should take that fact into account under the authority

accounting work for businesses in the entertainment field and for entertainers. For many years, he has represented entertainers and authors in connection with film production and distribution matters, has assisted in the production of a film, and many years ago had himself worked as a professional musician. In connection with the matters involved, Abramson was assisted by his legal adviser, Felix Ziffer (Ziffer), who is an attorney, practicing in New York City and specializing in "leisure time activities" which includes the motion picture industry. From time to time, Ziffer has represented several of the major film producers and distributors and many businesses and individuals in business matters pertaining to the production and distribution of films. On occasion, he and Abramson have represented the same client in specific matters and Ziffer has also represented Abramson, personally, from time to time, in motion picture matters. Ziffer, at some point in the past, also acquired and produced films for his own account.

Submission is a color, feature-length (96 minutes) motion picture made in Europe in the English language and post-synchronized.[6] The principal actor, Franco Nero, in 1976 had played roles in other movies successfully distributed in the United States, with some United States name recognition. The lead female, Lisa Gastoni, also had some recognition in this country. Submission is well photographed and directed and is of a quality quite acceptable to U.S. audiences. It has an MPAA rating of R. In content, Submission is similar to "Emanuelle" and "Story of O," which were X-rated films distributed shortly prior to 1976. Submission is similar to the film "Swept Away" which also had a successful box office reception in the United States.

In early 1976, Submission was brought to the attention of Joseph Brenner (Brenner), the principal officer of Joseph Brenner Associates, Inc. (Associates), a small, independent distribution company which had been in that business since 1954. From 1954 to the date of trial, Associates has

---

of *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). We conclude that such fact is not material in this case.

[6]There is a disagreement between the parties as to whether the film was made in English or the English language dubbed in later on. Our finding is based on the testimony of Felix Ziffer and the written appraisal of one of respondent's agents, Woodrow Sherrill, as well as the lack of any contrary evidence.

acquired the distribution rights to 40 to 50 films. Brenner was interested in Submission and arranged to screen it with his son and other associates. Based on the screening, he concluded that the film would appeal to all types of audiences and would play in top theaters. In his judgment, it was of good quality, had superb acting, and excellent music. He negotiated with Walter Bedogni, an officer of Rizzoli Co., S.P.A., the owner of the film, which led to a proposal to contract with Associates for the distribution rights for an advance payment of $150,000 in cash plus a percentage of distributor film rentals. Negotiations ceased because the cash payment was more than Associates could afford to pay.

Thereafter, the film was presented to Abramson and Ziffer, with the information that Associates was interested in the distribution rights. At this time (the latter part of 1976), Abramson was looking for films to present to investors using the criteria that the film must be commercially feasible and viable and well produced with name actors. Prior to screening Submission, they had screened five to eight other films. The film was screened by Abramson and Ziffer twice during the month of November 1976. Negotiations went forward somewhat simultaneously with Bedogni with respect to the acquisition of the film and with Associates with respect to distribution of the film. One of the factors which influenced Abramson to negotiate for acquisition of the film was Brenner's excitement about its prospects and his (Brenner's) conclusion that Submission could generate several million dollars worth of distributor film rentals. Abramson and Ziffer were both aware of the substantial success of the films "Story of O," "Emanuelle," and "Swept Away," which had generated $3 to $6 million in film rentals. On that basis, Abramson estimated that his prospective investor group would do very well. During the course of negotiations with the seller's agent, Abramson and Ziffer were informed that "Submission," under the name "Scandello" had been shown in foreign markets and generated approximately $340,000 of revenues. They were also informed that the production cost was approximately $2 million.

The initial asking price for Submission was $1 million in cash plus a percentage of film rentals. The agreed upon price for the right to exploit Submission in the United States was $1,750,000, payable $225,000 in cash and $1,525,000 evidenced by a nonnegotiable, nonrecourse promissory note with interest. The note was due in 10 years, but was also payable out of one-half of the revenues received by Surhill from the film's distribution. As discussed below, payment of the purchase price was guaranteed by the partners. The deferral of a substantial portion of purchase price was valuable to Abramson's prospective investors.

Abramson and Ziffer also negotiated a distribution contract with Associates. The agreement required payment by Associates to Surhill of a percentage of net distributor film rentals, that is the excess of Associates' receipts over its expenses, but modified in that advertising expenses in one location could not be offset against revenues from another location.[7] This agreement called for a payment by Associates of $50,000 as an advance against Surhill's share of film rentals. The sum of $25,000 was payable as soon as the film was delivered to Associates. The balance was in the form of a guarantee that Surhill would receive as its share of film rentals not less than the additional sum of $12,500 by September 15, 1977, and the further sum of $12,500 by December 15, 1977. This advance was to be repaid out of Surhill's share of revenues. It was unusual in this time period for Associates to make an advance to the owner of a film.

The distribution agreement covered the United States of America, its Territories and Possessions, all U.S. ships at sea and airplanes, bases of the Armed Forces, the Red Cross, the Veteran's Administration, and other governmental agencies. The term of the agreement is 15 years. Associates was required to exhibit "Submission" in at least two theaters in the United States prior to December 31, 1976, and in not less than 25 theaters during the year 1977.

Acquisition of the U.S. rights to Submission was consum-

---

[7]Net receipts are apportioned under the distribution agreement as follows: up to $500,000, 70 percent to Associates and 30 percent to Surhill; from $500,000 to $1 million, 65 percent to Associates and 35 percent to Surhill; from $1 million to $1,500,000, 60 percent to Associates and 40 percent to Surhill; and on gross receipts in excess of $1,500,000, 50 percent to each party.

mated in Switzerland on December 21, 1976[8] and the distribution agreement with Associates was executed on December 22, 1976. All of the limited partners in Surhill were either clients of Abramson or of another certified public accountant who was compensated for his services in securing investors. Abramson, for his services, received the sum of $3,000, and Creative, the sum of $66,000 out of the initial capitalization of Surhill.

The closing documents consisted of the purchase agreement between Surhill and the seller of Submission, the promissory note, a copy of which was attached to the purchase agreement, a security agreement, a copy of which was attached to the promissory note, and the guarantee agreements referred to in, and a copy attached to, the promissory note.[9] Surhill filed a Form UCC-1 financing statement pursuant to New Jersey law to protect the seller's security interest in Submission.

The most critical document in this case is the so-called guarantee agreement[10] entered into by each of the limited partners and by the general partners. This document, as well as the partnership agreement and the promissory note, was drafted by Gerald Rubin, a New Jersey attorney who specialized in corporate, tax, and commercial matters. The documents were drafted so as to respond to the requirements of the seller of the film that each partner would have personal liability for payment of a pro rata share of the note when due, but to provide the limited partners with the

---

[8]For reasons not explained, an entity described as "Transcontinental Films Anstalt" executed the purchase agreement as the seller. However, the title of Surhill is not an issue in the case.

[9]It is not clear from the record whether Surhill used a single note and a single guarantee, each with multiple signatures or multiple counterparts, together constituting the note and the guarantee. Therefore, for convenience we have assumed single instruments in each case.

[10]We have adopted petitioners' use of the terms "guarantee" and "guarantor" although neither term is used in its conventional sense. A guarantee is a collateral promise or undertaking by one person to answer for payment of some debt in case of default of another who is liable for such payment in the first instance. Thus, by right of subrogation, a guarantor has a remedy against the principal obligor to recover any amounts he has to pay to the creditor. See *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

As guarantors of an otherwise nonrecourse note, however, petitioners have incurred personal liability where the partnership has only limited liability. Therefore, petitioners and their assets are both primarily and ultimately liable to the sellers in the event of a default. They are primarily liable because neither the partnership nor any of its assets (other than the film) is subject to the nonrecourse obligation. They are ultimately liable, because there is no primary obligor against whom they have a right of subrogation. See *Smith v. Commissioner*, 84 T.C. 889, 908 (1985). Thus, on these facts, we use the terms "guarantee" and "guarantor" as including both primary and ultimate liability.

benefit of limited partner status under New Jersey law and to preclude any partner, limited or general, from acquiring joint liability, that is, from being responsible to the seller of Submission for more than that partner's pro rata share of the promissory note. The pertinent part of the guarantee agreement reads as follows:

### GUARANTEE AGREEMENT

The undersigned hereby guarantees and promises to pay to Transcontinental Films Anstalt that percentage of the unpaid balance due Transcontinental Films Anstalt pursuant to a certain Promissory Note of even date in the principal sum of $1,525,000 issued to it by Surhill Company, a New Jersey Limited Partnership, in the event of a default by Surhill Company in payment of such note, set forth opposite his name below.

*   *   *   *   *   *   *

Under no circumstances shall any of the undersigned persons have any liability under this guarantee or the Promissory Note issued to Transcontinental Films Anstalt in any amount greater than the percentage set forth opposite the undersigned's name above, multiplied by the outstanding balance due under the Promissory Note issued by Surhill Company to Transcontinental Films Anstalt at the time of default thereunder, after reduction for any amounts payable to Transcontinental Films Anstalt pursuant to the exercise of its rights under a certain Security Agreement of even date.

Pertinent extracts from the subscription agreement, the promissory note, and the private placement memorandum are set forth in Appendix B attached hereto.

Although it is clear from the facts that Surhill was formed solely to acquire and exploit Submission, the partnership agreement is very general, merely reflecting that the property to be acquired by the partnership is a motion picture film. On the other hand, the private placement memorandum fully summarizes the transaction, including the required execution of the guarantee agreement, a copy of which is attached, together with copies of the other agreements requiring execution by the limited partners. The subscription agreement also emphasizes the personal liability to be assumed under the guarantee agreement. While the acquisition agreement describes the note as a "nonnegotiable, recourse promissory note," the note is actually a nonrecourse note in that it expressly provides that neither the general partners nor the limited partners will have any personal liability of any kind or nature on the note except

as provided in the guarantee agreement. The so-called guarantee agreement, executed by each partner (general and limited) in his capacity as a partner, obligates each person to pay to the seller that percentage of the unpaid balance due the seller in the event of a default which is equal to the partner's percentage interest. A default occurs upon non-payment of the balance due on the $1,525,000 on December 20, 1986. At that point, the seller must foreclose on the film and it may then look to each partner for that partner's share of the unpaid balance of the indebtedness.

Submission was initially shown in December 1976 in a theater in San Antonio, Texas, with very poor results. That did not, however, lessen Associates' enthusiasm for the film. However, later test showings were also disappointing. Development of advertising programs as well as screenings by representatives of theater chains and other prospects for exploitation continued during 1977 and thereafter. Nero made a special trailer[11] at substantial expense. Submission was also screened for cable television and home video. Associates expended more than $100,000 of its moneys (in addition to the $50,000 advance) in preparation for distribution of the film. This is a larger sum than Associates has spent promoting any other film. At least in part because of the money spent by Associates and the delay in release of Submission, during 1977 Brenner requested that the scheduled payments in that year be delayed. Ultimately, Abramson agreed and the second $25,000 was not paid until 1978.

Representatives of several of the major theater chains expressed an interest in acquiring rights to show Submission, and Associates also engaged in negotiations with Revlon for some sort of joint exploitation which would be coupled with the issuance of a perfume under the name "Submission." However, Submission was not released for general distribution in 1977. One problem with release in that year was the distribution at that time of a hard- core pornographic film under the title 'Nights of Submission," which Brenner thought might damage the public acceptance of Submission. Eventually all negotiations for distribution

---

[11]A trailer is a short promotional, usually an excerpt from a movie, which is shown in theaters as a "coming attraction."

of the film ceased, with the idea of eventually changing Submission's name and releasing it again as a new film. Submission won an award at the Virgin Island Film Festival in 1977 or 1978.

During the period 1975-78, the movie industry was undergoing a change in that interest in drive-in theaters was diminishing, with many being closed down. In their place, many small indoor theaters were being constructed, often several at one location. Associates had been very successful in the distribution of films for drive-in theaters but recognized that it would have to change its direction. Brenner thought that Submission was an ideal vehicle to use to break into distribution to better theaters. As a rule of thumb, 1 film out of 10 is successful, although Associates' success rate in films it had distributed prior to 1976 was between 85 and 90 percent, its success rate dropping to approximately 50 percent in 1976 and 1977.

During the years in issue, none of the persons involved in these matters (including the partners of Surhill) had any financial or other ownership interest in any other person. Negotiations with the seller of Submission and with Associates were conducted by Abramson and his advisers in a business-like fashion. Surhill maintained normal books and records. Abramson as general partner of Surhill acted reasonably in keeping abreast of Associates' efforts to exploit Submission.

### ULTIMATE FINDINGS OF FACT

Surhill and its general partners acquired Submission with a predominant profit objective at a purchase price and upon terms determined after arm's-length bargaining between unrelated parties. The value of Submission on the date of acquisition was its purchase price—the sum of $1,750,000, payable $225,000 in cash, with the balance payable out of revenues and due in all events at the end of 10 years.

### OPINION

#### Activity for Profit

The first issue for decision is whether the partnership's business was an activity engaged in for profit for the

purposes of section 162.[12] The burden of proof is upon petitioners to demonstrate the necessary profit objective. *Golanty v. Commissioner*, 72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Rule 142(a). In order to constitute a trade or business for purposes of section 162, the activity must be carried on in good faith, with the dominant hope and intent of making a profit. *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). Determination of the profit objective is based upon all of the facts and circumstances. *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In the case of a partnership, the profit issue is determined at the partnership level on the basis of the activities of the partnership and of the general partners. *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984).

This does not mean, however, that our inquiry is confined solely to the activities of the partnership, for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such case, a partnership can rely upon the expertise of third parties * * * . The scope of the relevant inquiry therefore expands to encompass the entirety of such multilayered transactions. [Flowers v. Commissioner, 80 T.C. 914, 932 (1983).]

See also *Fox v. Commissioner*, 80 T.C. 972, 1008 (1983), affd. by order 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-9 (3d Cir. 1984). On this issue, our decision is conclusively for petitioners.

As we have found, in 1976 Associates was a small but established and nationally recognized producer and distributor of films, with established expertise. In arm's-length bargaining, Abramson and Ziffer negotiated with an agent

---

[12]Petitioners have argued somewhat interchangeably that Surhill was engaged in a trade or business with a profit objective for purposes of sec. 162 and that Surhill was engaged in an activity for the production of income under sec. 212. Since the record discloses that Surhill, the partnership, was an active entity, we will treat the profit objective issue as arising under sec. 162. See *Flowers v. Commissioner*, T.C. 914, 931 n. 23 (1983). As pointed out, this case was tried as a companion case to *Sheid v. Commissioner*, T.C. Memo 1985-402. The facts are comparable and with the exception of the section 465 issue, much of the applicable law and its application to the facts is substantially identical. We have, therefore, as a matter of convenience, plagiarized extensively from that opinion.

of an unrelated foreign producer terms for the purchase of Submission, and similarly negotiated with Associates for distribution of the film. While the aggregate of the cash and deferred portions of the price, $1,750,000, is in excess of the original cash asking price of $1 million, that asking price also included a percentage of revenues generated by Submission. There is nothing in this record to suggest that Abramson could have negotiated a better bargain. Neither is there anything improper or even suspicious in taking into account, as Abramson did, the fact that deferral of a portion of the purchase price for 10 years was valuable to the Surhill partners, all of whom were reasonably wealthy. Abramson did not consciously or unconsciously inflate the purchase price. As we have found, Submission was worth exactly what Surhill agreed to pay—$225,000 in cash and a fixed deferred obligation payable with interest in 10 years in the amount of $1,525,000.[13]

Also the distributor was reputable, well established, and nationally recognized. The distribution agreement was in fact more favorable to Surhill than was customary, and the $50,000 advance was the largest made up to that time by Associates. This was clearly not a typical abusive tax shelter scenario.

A profit objective may be analyzed in relation to the nine factors set out in respondent's section 183 regulations,[14] but those factors are not applicable or appropriate for every case. The facts and circumstances of the case in issue remain the primary test. *Golanty v. Commissioner, supra*; *Dunn v. Commissioner, supra* at 720. The initial profit projections furnished by Associates to Abramson and made by Abramson and Ziffer based on their own knowledge of comparable films were reasonable and were based upon the experience of knowledgeable persons. Abramson and Ziffer at this time had considerable experience in the movie industry.

The deferral in 1977 of exploitation of Submission was explained satisfactorily. We found Brenner to be a credible witness. While he may have been overly optimistic as to

[13]The seller did assume the risk of the solvency of each partner of Surhill for the 10-year period since each partner was obligated for that partner's percentage of the deferred obligation. We assume that this factor played a part in the negotiations.

[14]Sec. 1.183-2(b), Income Tax Regs.

Submission's prospects of success, he held sincere beliefs and acted according to his best judgment and in good faith, expending a substantial sum of money in the process. Abramson and Ziffer also acted as reasonable businessmen. Petitioners have conclusively established the good-faith profit objective of the general partner, Abramson (and thus of Creative), and of the partnership and all limited partners.

Respondent argues that a profit motive is negated by the fact that the price of the Film so far exceeded its fair market value as to preclude petitioners from making a profit, relying on our opinion in *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). But respondent fails to recognize that, when a property is purchased as a result of good-faith arm's-length bargaining between unrelated parties, with neither buyer nor seller being under any compulsion and there being no special circumstances present, the purchase price will in general reflect the value of the article purchased at the time of purchase. As we have found in this case, the value of the film was its purchase price.[15] On this record, it is at least open to question whether appraisal testimony has any relevance.[16]

On issue (1) we hold for petitioners. Having found for petitioners on the profit objective issue, we automatically conclude that petitioners are entitled to the business expense deductions claimed on the Surhill returns.

*Analysis of the Documents*

Extended analysis of the partnership and/or transaction documents is not required. New Jersey law is applicable and, unfortunately, neither party has favored us with a discussion of applicable law, except that Gerald Rubin, the New Jersey attorney responsible for drafting the documents, testified that this arrangement of an apparently

---

[15]The promissory note calls for simple interest at 5 percent per annum. Respondent has not questioned the reasonableness of this note.

[16]Conceivably, in some circumstances appraisal testimony may help a court to arrive at the conclusion that the purchase price represents market value, but where that determination is made independently, appraisal evidence becomes immaterial. Moreover, respondent's appraisers were far from impressive. They gave every indication that they were simply performing by rote, in a biased fashion, the task for which they had been employed. In addition, at least one of the appraisers obviously allowed his personal distaste for Submission to override his objectivity.

nonrecourse promissory note qualified by a limited recourse agreement is common practice in New Jersey in connection with acquisition of real estate by partnerships. He stated that to his knowledge no New Jersey court had construed such a series of documents but, in his opinion, the partnership agreement would be interpreted as creating a limited partnership. Mr. Rubin further expressed the opinion, and we agree, that each partner incurred an 'absolute obligation' to pay his share of the unpaid balance, which sum would be determinable after disposition of the film pursuant to the security agreement.

Without any question, the partnership documents include not only the partnership agreement but also the private placement memorandum and the subscription agreement. They also incorporate by reference the promissory note and the so-called guarantee agreement, both of which were exhibits to the private placement memorandum. These documents are all "inseparably linked." *Zappo v. Commissioner*, 81 T.C. 77, 85 (1983). Thus, we conclude that the partner's obligations as guarantors were undertaken pursuant to the partnership agreement.[17] See also *Raphan v. United States* , 759 F.2d 879 (Fed. Cir. 1985). The partners in this case entered into the guarantee agreement in their respective capacities as limited and general partners, and in so doing, they incurred liability for payment of the balance due on the $1,525,000 note when it matures.

### Basis

The next issue for decision is whether the petitioners may increase their bases in Surhill as a result of their guaranteeing the note given by Surhill to the seller of the film.

Section 752(a) provides that "Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership." Pursuant to section 722, a contribution of money by a partner to the partnership increases the partner's basis in the partnership.

---

[17]*General Electric Credit Corp. v. Castiglione*, 142 N.J. Super. 90, 360 A.2d. 418 (1976).

As a result of the direct obligation undertaken by each petitioner qua partner to pay to the seller a portion of Surhill's debt pursuant to the so-called guarantee, each partner in Surhill increased his share of Surhill's liabilities. Thus, pursuant to sections 752(a) and 722, each partner's basis in Surhill is increased as a result of this additional personal obligation as to which each partner is ultimately liable. See *Smith v. Commissioner*, 84 T.C. 889, 908 (1985).[18]

The guarantee of an otherwise nonrecourse note places each guaranteeing partner in an economic position indistinguishable from that of a general partner, with liability under a recourse note—except that the guaranteeing partner's liability is limited to the amount guaranteed. While recognizing that under State law there may be differences between the obligations of a general partner and those of a limited partner guarantor, such differences should not be controlling for Federal tax purposes. Each is obligated to use his personal assets to satisfy, pro rata, the partnership liability. In effect, the limited partners are the equivalent of general partners to the extent of their pro rata guarantees especially since, as to this obligation, the liability of the general partners is limited. Economic reality dictates that they be treated equally, and we so hold. Consequently, both general and limited partners will be entitled to include such liabilities in their basis to the extent of their pro rata guarantees. The $1,525,000 liability is apportioned to them in accordance with their loss ratios under the partnership agreement.

This holding is consistent with, and foretold by, our decision in *Smith v. Commissioner, supra.* In the *Smith* case, one of the partners executed and contributed to the partnership an assumption agreement as to a nonrecourse partnership liability. We held that the partner's basis was increased by the amount of the debt assumed, saying:

Where, as here, the partner becomes ultimately liable to pay the debt, it is irrelevant for purposes of section 752(a) that the partnership or its property remains liable to the mortgagee. * * * By taking on ultimate and unconditional liability, petitioner constructively contributed the

---

[18]We have found that the seller of the film would not have entered into the transaction with Surhill unless each partner of Surhill agreed to personally obligate himself for payment of a portion of the deferred sales price.

amount of the indebtedness to the partnership, and was thus entitled to increase his basis * * * [*Smith v. Commissioner*, 84 T.C. at 980.]

Our facts are different, in that the property, i.e., Submission, was still liable for the indebtedness, and Surhill was obligated to pay the seller of the film one-half of its film rentals. We do not believe that these differences alter the result. In this partnership transaction, each partner is directly and ultimately liable for a pro rata portion of the obligation. The fact that the obligation might be paid in part by application of film rentals to which each partner otherwise would be entitled does not preclude the acquisition of basis.[19]

## At Risk Issue

The "at risk" provisions were enacted to prevent a taxpayer from deducting a loss in excess of his economic investment in a particular activity at the close of a taxable year. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86. The holding, producing, or distributing of motion picture films is included within the activities covered by the "at risk" provisions. Sec. 465(c)(1)(A).

A taxpayer is generally to be considered "at risk" as to any amounts borrowed for use in an activity with respect to which the taxpayer has personal liability for payment from his personal assets. S. Rept. 94-938, *supra* at 87. A taxpayer is not "at risk," however, to the extent that he is protected against economic loss. S. Rept. 94-938, *supra* at 87. Our opinion in *Brand v. Commissioner*, 81 T.C. 821 (1983) is distinguishable from the case at hand. With no primary obligor, the limited partners in this case have no right of reimbursement. They have no protection against economic loss of the kind Congress had in mind.

This case involves an obligation on which each partner, general and limited, is directly liable to the seller of the film. The nonrecourse form of the obligation was used to avoid joint and several liability among the partners, and the "guarantee" was simply the means by which each partner

---

[19]We decline to rely upon the regulations under sec. 752. They were not drafted with a transaction such as this in mind since this format was devised to respond to the 1976 "at risk" rules. Our analysis fits the statutory provision and case law, which is sufficient. See, e.g., H. Rept. 98-432 (Part 2) 1235-1236 (1984).

agreed with the seller to be personally liable for a specific portion of the debt.

*Pritchett v. Commissioner*, 85 T.C. 580 (1985), is distinguishable. In *Pritchett*, the limited partners were not directly liable to the lender on the partnership obligation. Rather, the general partner was personally liable to the lender on the recourse obligation, and the limited partners were, if anything, potential indemnitors of the general partner. The limited partners were not obligated on any debt for purposes of section 465 until the general partner called for contributions to the partnership. Consequently, in *Pritchett*, the limited partners had not borrowed any amount within the meaning of section 465(b)(2). In this case, to the contrary, each partner is personally and directly liable for a pro rata part of the amount owed to the seller of the film, which had no interest in the activity of the partnership other than as a creditor. Because each partner's liability for the partnership debt (in the words of the statute, for the "amounts borrowed") ran directly to the seller and each partner's liability was personal, each partner is at risk for his proportionate share of amount owed to the seller.

We hold for petitioners on this issue.

*Depreciation*

The final issue is whether Surhill is entitled to deductions for depreciation in 1977 or 1978 and, if so, the amount of the deduction. Surhill adopted the income forecast method of depreciation. In each of the years 1976 and 1977 it reported income in the amount of $25,000 and claimed depreciation deductions. The deduction taken for the year 1976 is not in issue. With respect to 1977, respondent takes the position that Surhill realized no income due to the agreement made with Associates to defer the payment due that year to 1978. Petitioners claim that respondent improperly computed their 1977 deduction in several respects, including the contention that $25,000 of income should be recognized in 1977 and none in 1978.

Surhill is an accrual method taxpayer and as such it must recognize income in the year in which the right to receive the income becomes fixed. *Spring City Foundry Co. v.*

*Commissioner*, 292 U.S. 182 (1934); *H.H. Brown Co. v. Commissioner*, 8 B.T.A. 112 (1927); *Selwyn Eddy Co. v. Commissioner*, 25 B.T.A. 1341 (1932). Sec. 1.451-1(a), Income Tax Regs. Under the distribution agreement, the right to the initial advance payment became fixed in 1976 when "complete delivery" of Submission was made to Associates. Thus, that sum was clearly taxable in 1976. As to the second $25,000, the only issue as to the year taxable is created by the agreed deferral from 1977 to 1978.[20] The record is unclear as to exactly when Surhill agreed to the deferral but presumably it was prior to September 1977 when the first installment was due. The fact that the sum was payable in installments and that payment of the second $25,000 was by agreement deferred until 1978 is immaterial. Under the accrual method of accounting, receipt of payment is generally not the critical item. *Schock v. Commissioner*, 1 B.T.A. 528, 530 (1925). The agreed deferral of payment did not make the obligation to pay indefinite, uncertain, or contingent in any fashion. Therefore, the second $25,000 payment was taxable income in 1977. See, e.g., *Selwyn Eddy Co. v. Commissioner, supra.* This conclusion does not, however, resolve the depreciation issue.

The income forecast method of accounting is described in Rev. Rul. 60-358, 1960-2 C.B. 68, as amplified in Rev. Rul. 64-273, 1964-2 C.B. 62. For years involved, taxpayers are not required to use the income forecast method but may elect to use it. However, when they do so, they are required to follow the method as prescribed by respondent. *Greene v. Commissioner*, 81 T.C. 132 (1983). The method is intended to match income and depreciation deductions and no depreciation can be taken in a year in which there is no income. *Greene v. Commissioner, supra*; *Wildman v. Commissioner*, 78 T.C. 943 (1982). The deduction is determined by multiplying the basis of the property by a fraction, the numerator of which is the year's income and the denominator is the forecasted income. As to the deduction, petitioners have the burden of proof. Rule 142(a). As respondent properly points out, there is absolutely no evidence to support the alleged estimate of total income for the year

---

[20]Neither party has suggested that the entire $50,000 was accruable in 1976; hence, we will not consider that question.

1977 of $73,529. While we agree with petitioners that the numerator of the fraction is $25,000, we have no evidence on which to base an estimate of total forecasted income as of the end of the year 1977.

According to respondent's revenue ruling:

The total forecast or estimated income to be derived from the films should be based on the conditions known to exist at the end of the period for which the return is made. This estimate can be revised upward or downward, as explained above, at the end of subsequent taxable periods based on additional information which became available after the last prior estimate. [Rev. Rul. 60-358, 1960-2 C.B. 69.]

While it appears that forecasted income used for 1976 was $50,000, there is neither evidence to support that estimate nor to show that it remained correct as of December 31, 1977. The statutory notice disallowed all depreciation for 1977, and we have no choice but to accord to that determination its presumption of correctness. Similarly, there is no basis for any depreciation deduction in 1978. For this reason, we need not determine the basis of the property for depreciation purposes in either year.

Based upon the foregoing,

*Appropriate orders will be issued.*

Reviewed by the Court.

STERRETT, GOFFE, CHABOT, PARKER, SHIELDS, COHEN, SWIFT, JACOBS, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with the majority opinion.

NIMS, KÖRNER, and HAMBLEN, *JJ.*, agree with the result only.

SIMPSON, WILBUR, and GERBER, *JJ.*, did not participate in the consideration of this case.

---

## APPENDIX A

| Petitioners | Docket Nos. | Tax years | Deficiency | Residence when petition filed |
|---|---|---|---|---|
| Edwin D. and Sondra M. Abramson | 4524-82 16213-83 | 1977 1978 | $3,170.00 5,758.00 | Livingston, New Jersey |

| Petitioners | Docket Nos. | Tax years | Deficiency | Residence when petition filed |
|---|---|---|---|---|
| Rudolph R. and Aurea P. Cestone | 5336-82 16623-82 | 1977 1975 1978 1979 | $8,575.00 11,277.50 44,816.00 55,299.00 | North Caldwell, New Jersey |
| Edwin P. and Jo Marie Stivaly | 5622-82 16624-82 | 1977 1975 1978 1979 | 8,282.90 12,693.00 42,346.96 45,609.72 | Glen Ridge, New Jersey |
| Charles and Margaret Stanziale | 5588-83 14479-83 | 1977 1978 | 8,862.00 4,154.50 | West Orange, New Jersey |
| Edward and Marilyn Sturchio | 5588-83 | 1977 | 26,937.00 | Short Hills, New Jersey |
| Seymour H. and Shirley S. Miller | 5854-83 | 1977 1978 | 11,408.00 1,700.00 | Oradell, New Jersey |
| John N. and Mary Jane Tolpa | 5854-83 | 1977 1978 | 6,394.00 5,155.00 | Whippany, New Jersey |
| Estate of John Tolpa, deceased, Mona Tolpa, executrix, and Mona Tolpa | 5854-83 | 1977 1978 | 9,123.00 4,474.00 | Montclair, New Jersey |
| Joseph and Marie Pieretti, Jr. | 15578-83 | 1977 1978 1979 | 83,224.00 17,961.00 42,727.00 | Bloomfield, New Jersey |
| Brookdale Beverage Co., Inc. | 15581-83 | 3/31/76 3/31/77 3/31/78 3/31/80 | 112,187.00 9,205.00 76,574.00 34,885.00 | Clifton, New Jersey |

## APPENDIX B

I. *Confidential Private Placement Memorandum, Surhill Company, (A New Jersey Limited Partnership)*

THE DATE OF THIS CONFIDENTIAL MEMORANDUM IS DECEMBER 10, 1976.

\* \* \* \* \* \* \*

EACH PURCHASER OF A UNIT WILL BE PERSONALLY LIABLE FOR A MAXIMUM OF $114,375 PER UNIT IF CERTAIN EVENTS TAKE PLACE (SEE "RISK FACTORS").

\* \* \* \* \* \* \*

## RISK FACTORS

The purchase of the units offered hereby involves a high degree of risk * * * . In particular, the following factors should be carefully and fully considered.

1. Each investor will sign a guarantee agreement wherein he will guarantee payment of a proportionate part of the amount due under the Purchase Money Mortgage Note to be issued to the Seller of the film, including a proportionate part of accrued but unpaid interest on the note. The maximum amount of the guarantee, including accrued and unpaid interest will be $114,375 per unit. The Guarantee Agreement is annexed hereto as Exhibit B. Prospective Investors should carefully review the Guarantee Agreement with their advisors.

*    *    *    *    *    *    *

9. * * * The Limited Partnership will enter into an agreement with Joseph Brenner Associates, Inc. (Brenner) with respect to the distribution of the motion picture. It is possible that the Limited Partnership will not receive any income or funds from the distribution of the film, other than the amount guaranteed by Brennen as per the terms of the Distribution Agreement. (See "Proposed Activities - Distribution of Film".)

*In such an event, and if the anticipated tax benefits arising from the purchase of a unit are lost, each investor will lose $16,500 on each unit purchased, (his cash investment) and in addition will be personally liable to the Seller of the film for an amount determined by mulitplying his percentage interest in the Limited Partnership's profits and losses by the unpaid balance due on the Mortgage Note including accrued but unpaid interest which would be $114,375 per unit. Accordingly, the total loss per unit could be $130,875.*

## II. *Subscription Agreement*

I hereby acknowledge receipt of the CONFIDENTIAL MEMORANDUM of SURHILL COMPANY, dated December 15, 1976 and all exhibits and other attachments thereto. I have read the CONFIDENTIAL MEMORANDUM and fully understand the nature and terms of the investment and the possible tax treatment of the investment.

*    *    *    *    *    *    *

I know that I will be personally liable for a proportionate part of the Purchase Money Mortgage Note to be issued to the Seller of the film in the event of a default thereunder. I have carefully read the Guarantee Agreement (Exhibit B of the Confidential Memorandum) and after discussing the Guarantee Agreement with my advisors, I am fully aware of my legal obligations under the Guarantee Agreement.

*    *    *    *    *    *    *

The undersigned hereby specifically accepts and adopts each and every provision of the Limited Partnership Agreement annexed as an exhibit to the Confidential Memorandum and agrees to be bound by all of the terms and provisions of said agreement.

III. *Promissory Note*

This Note is issued pursuant to and subject to all of the terms and conditions of the Acquisition Agreement, and Payee shall be subject to all defenses and claims which Maker or his assigns may have against Payee under such Acquisition Agreement or any other Agreement between the Maker and the Payee.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

This Note is being issued by Surhill Company, a New Jersey Limited Partnership. The General Partners of Surhill Company are Edwin Abramson and Creative Film Enterprises, Inc., a New Jersey Corporation and its Limited Partners are set forth in Schedule A annexed hereto and made a part hereof. Except as provided in the Guarantee Agreements annexed hereto, the terms, conditions and provisions of which are incorporated herein by reference in their entirety, neither the General Partners, Edwin Abramson and Creative Film Enterprises, Inc. or any of the Limited Partners of Surhill Company shall have any personal liability of any kind or nature on this Note and no personal judgment shall or may be rendered against them with respect to the obligations evidenced by this Note.

---

SWIFT, *J.*, concurring: I agree with the result reached by the majority opinion but wish to comment on one aspect of the partnership's obligation under the loan. The majority correctly concludes that the $1,525,000 promissory note is nonrecourse as to the general and limited partners. Under the relevant loan documents, however, as I read them, it appears that the $1,525,000 promissory note is recourse as to the partnership itself (namely, Surhill). If so, the creditor, Rizzoli Co., is entitled to seek full recourse against all of Surhill's available assets if a default on the note occurs.

The apparent recourse nature of the promissory note as to Surhill, however, does not make the obligations of the general and limited partners secondary to Surhill's obligation. For Federal tax purposes, the fact that none of the partners has personal liability on the promissory note elevates the obligations of the partners under the guarantee agreements to primary obligations.

With the clarification that the promissory note appears to be recourse as to Surhill, I agree with the majority's conclusion that *Brand v. Commissioner*, 81 T.C. 821 (1983), is not applicable to the partners' obligations because the partners have no other person or partner to whom to look for reimbursement should they be required to make payments under the guarantee agreements.

WILLIAMS, *J.*, concurring: I fully agree with the majority's opinion and write separate views only because I believe it necessary to express additional support for the distinction the majority draws between this case and *Pritchett v. Commissioner*, 85 T.C. 580 (1985). While bearing superficial resemblance to each other, the two cases are very different.

First, the lender in this case very clearly had no interest in the activity "other than as a creditor" and was not "related" to any of the debtors. Sec. 465(b)(3). In *Pritchett*, the ultimate obligee was the promoter of the activity. See concurring opinion of Judge Simpson in *Pritchett.*

Second, in this case, each partner was fully and personally obligated for his proportionate share of the partnership's indebtedness to the lender. In *Pritchett*, quite to the contrary, the limited partners were not liable on the debt to the lender, rather they were liable, if at all, to the general partner. The recourse obligation in *Pritchett* effectively made the general partner personally liable for repayment of the obligation. The limited partners were not liable for any portion of the debt but were liable for an amount equal to any outstanding balance of the debt at a future date only if called upon by the general partner for additional contributions necessary to retire the remaining balance of the debt. Thus, the limited partners in *Pritchett* were in effect liable only to indemnify the general partner against personal loss. Because the limited partners were liable, if at all, only to indemnify the general partner in *Pritchett*, they were not liable for "an amount borrowed" until the general partner called upon them to contribute to the partnership. Even if it can be said that this contingency should be treated as an amount borrowed, because it is fundamentally owed to the general partner, it is owed to someone who has an interest in the activity other than as a creditor as well as to one who is "related" within the meaning of section 465(b)(3)(C). The legal obligations of the limited partners in this case stand in stark contrast to those of the limited partners in *Pritchett.*

Third, the payment out of income does not make the obligation in this case in any way contingent. There is personal liability for the *full* amount of the debt. In this case, unlike *Pritchett*, the amount of indebtedness for which each partner is liable is fixed and known at the inception of the obligation and throughout its term. Payment of some or all of the debt during its term out of income of the partnership does not inject any contingency whatsoever into the determination of how much of the debt each partner is liable for.

In sum, the Court reached the correct result in *Pritchett* and reaches the correct result here. *Pritchett* is a very different case.

STERRETT, GOFFE, CHABOT, SWIFT, JACOBS, WRIGHT and PARR, *JJ.*, agree with this concurring opinion.

---

CLAPP, *J.*, dissenting: I wish to record my dissent with respect to the "At Risk Issue." I can find no meaningful difference between the facts in this case and those in *Pritchett v. Commissioner*, 85 T.C. 580 (1985). I would reach the same result as we did in that Court-reviewed opinion.