HARRY E. OSTEEN and GAIL M. OSTEEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Osteen v. Commissioner
Docket No. 17391-92
United States Tax Court
T.C. Memo 1993-519; 1993 Tax Ct. Memo LEXIS 530; 66 T.C.M. (CCH) 1237; November 10, 1993, Filed *530 Decision will be entered for respondent. David B. Ferebee, for petitioner. Harris Bonnette, for respondent. DINAN
DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: This case heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6661 1987
$ 7,176
$ 1,794
1988
5,469
1,367
Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioners resided in the State of Florida at the time they filed the petition in this case. Petitioners timely filed joint tax returns for the years 1987 and 1988. The issues for decision are: (1) Whether petitioners' horse *531 breeding operating were an activity not engaged in for profit within the meaning of section 183(a) for the years 1987 and 1988; and (2) whether petitioners are liable for additions to tax under section 6661 for the years 1987 and 1988. Petitioner Harry E. Osteen (hereinafter petitioner) is a full-time employee of Farmers and Merchants Bank of Trenton, Florida (Farmers) and since 1970 has been Farmers' president and chief executive officer (CEO). Petitioner has never engaged in other activities independent of his work at Farmers besides raising horses. Petitioner separated from his first wife in 1984 and was divorced in 1985. Petitioner married his second wife in 1986. Petitioner's second wife has been working full time as a registered nurse since they were married. Sometime in late 1982, petitioner became interested in breeding and raising Percheron [2] draft horses. At that time, there were no Percheron horses in the State of Florida, and there was a very limited market for the horses nationwide. Petitioner had little experience with horses generally, and no experience with Percheron horses. As a child growing up, petitioner's family had horses, some cattle, and from time *532 to time, hogs. To learn about Percheron horses, petitioner made inquiries with various draft horse registries, associations concerned with draft horses, local governmental agencies, and individuals in the industry. Petitioner received informational pamphlets and documents regarding horse production n Florida and draft horses in general. In 1983, petitioner and Mr. Langford, a local farmer, discovered they had a mutual interest in raising and *533 breeding Percheron horses. Petitioner and Mr. Langford subsequently entered into an informal partnership to breed Percheron horses on Mr. Langford's land. To this end, four Percheron horses were purchased in 1983, three by the partnership and one by petitioner. The partnership started calling itself "O'Ford Farms", purchased stationery in the partnership's name, and began advertising their Percheron horses in national horse publications. In 1984, petitioner chartered the first Draft Horse and Mule Association in Florida. Petitioner also purchased another Percheron horse, and two foals were born from the herd. However, in December of 1984, petitioner's partnership with Mr. Langford was abruptly dissolved after Mr. Langford was arrested for murdering his wife. Petitioner's first marriage also dissolved in 1984. In March, petitioner moved out of the family home into a mobile home on his mother's property (Bronson farm). Petitioner's divorce became final in 1985. Two foals were born that year, and one of the Percheron horses won a ribbon at the State fair. After Mr. Langford's arrest, the horses remained on Mr. Langford's land while petitioner searched for other accommodations. *534 In the spring of 1983, petitioner as able to move the horses to the Bronson farm. No payment was ever made to Mr. Langford for his interest in the horses. In late 1985, petitioner realized that he would be unable to care for the horses himself, so he began running advertisements in national magazines looking for a partner. In March of 1986, petitioner was contacted by Mr. Munksgard, a policeman in Pennsylvania, who expressed interest in moving to Florida and working on the farm. Mr. Munksgard, who was doing some breeding of horses in Pennsylvania, had been interested since childhood in running a "multi-faceted", self-sustaining draft horse farm. The farm Mr. Munksgard envisioned would be a working farm that would breed and raise draft horse while using the horses as substitutes for tractors. However, Mr. Munksgard had no previous experience with draft horses or farming in the State of Florida. After discussions with petitioner and a prelininary visit to Florida, Mr. Munksgard relocated his family to the Bronson farm in the spring of 1986. When Mr. Munksgard and his family arrived in Florida, the Bronson farm was a farm in name only. The farm was in significant disrepair, *535 and it needed a substantial amount of time merely to put the farm back in working order. While petitioner was searching for a partner, the only change to the herd had been the addition of a female mustang purchased from the government and the birth of two more foals, one of which died. The only work done to the Bronson farm was the erecting and repairing of fences, and this was done before the horses were moved from Mr. Langford's land. Mr. Munksgard worked on the Bronson farm for approximately 5 weeks before he returned to working full time. After working at two temporary positions, Mr. Munksgard started working for the Florida Department of Corrections. He continued working full time at the Department of Corrections until he left Florida in June of 1987. During 1986, petitioner also remarried. While on petitioner's property, very little work was done with the horses by Mr. Munksgard and his family, except for their attendance at the birth of four foals, two of which died. Rather, Mr. Munksgard's time was spent mostly cleaning up the Bronson farm, pulling stumps, erecting fence posts, building a shed, and performing remedial housekeeping. Petitioner's time at the farm was *536 even more limited. Because of petitioner's work at Farmers, petitioner was usually on the farm only during the weekends. In May of 1987, petitioner sold two of his Percheron foals for a total of $ 1,400. The year 1987 also produced two more foals, one of which was later traded in 1988. In June, petitioner's arrangement with Mr. Munksgard abruptly terminated when Mr. Munksgard's marriage ended, and Mr. Munksgard returned to Pennsylvania with his children. In 1988, petitioner began advertising all of his horses for sale. In April of 1988, petitioner, who by now had inherited the Bronson farm, moved a home, which had been owned by his father, onto the property and began living there with his family. Soon after moving onto the property, petitioner changed his advertising to seek someone to rent the land on which the horses were kept. In summary, from 1983 through 1988, petitioner purchased or acquired a total of 10 horses, 5 of which were Percheron, for a total cost of $ 16,350, and produced a total of 12 foals. Of the 12 foals born, 4 died and 2 were sold for $ 900 and $ 500, respectively. Petitioner continued breeding and selling Percherons after 1988. Between 1988 and 1991, *537 five more foals were born, and six foals were sold. From the sale of the six foals, petitioner received a total of $ 3,850, the highest amount for any of the horses being $ 1,300. In the course of carrying on his horse breeding activity, petitioner kept a separate farm ledger to record expenses, and such ledgers were reviewed by an accountant at the end of each year. The following table is a summary of revenues, expenses, and losses generated by petitioner's operations for the years 1983 through 1991. Year
Revenues
Expenses
Losses
1983
200 $ 8,665
$ 8,465
1984
600 11,157
10,557
1985
110 17,293
17,183
1986
20 13,453
13,433
1987
1,583 19,876
18,293
1988
(612)
19,527
20,139
1989
750 15,943
15,193
1990
6,654 11,303
4,649
1991
7,779 8,369
590
On petitioner's Federal income tax returns, petitioners deducted losses of $ 18,293 for 1987 and $ 20,139 for 1988 resulting from the operation of petitioners' horse breeding activities. In the notice of deficiency, the Commissioner disallowed such losses because she concluded that the horse breeding activity was an activity not engaged in for profit. Thus, the initial issue for decision is whether *538 petitioner's horse breeding activity was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides that if an individual is engaged in an activity, and if that activity is not engaged in for profit, then no deductions attributable to that activity shall be allowed except as otherwise provided under section 183(b). Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. The test for determining whether an individual is carrying on a trade or business under section 162 is whether the taxpayer's actual and honest objective in engaging in the activity is to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must establish that the taxpayers entered into the activity, or continued in the activity, with the actual and honest objective of making a profit. *539 Antonides v. Commissioner, 91 T.C 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, supra at 646. The taxpayer's stated intention to make a profit is not determinative; greater weight is given to objective factors rather than taxpayer's mere statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-(2)(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., lists nine nonexclusive factors to be considered in determining wither an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the *540 taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative of the issue. The issue is one of fact that must be resolved by the Court based on the facts and circumstances of each case, including factors not listed. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1-183-2(b), Income Tax Regs. The burden of proving the requisite intent is on the petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The following is an analysis of the nine relevant factors. Factor (1): Manner in Which the Taxpayer Carried on the Activity. Petitioner contends that the manner in which he conducted his operation is a strong indication of his intention to generate a profit. It is true that petitioner's activity had many of the trappings of a for profit business. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1982). Petitioner maintained detailed and thorough financial records of his operation. He advertised, printed business stationery, subscribed *541 to publications concerning Percheron horses and draft horses in general, and attended draft horse meetings. Yet, the care and detail in which petitioner recorded and classified his expenses makes the omission of a profit or income objective even more apparent. Despite the fact that losses continued to mount from $ 8,846 in 1983 to $ 20,139 in 1988, petitioner, the CEO of a bank, did not introduce evidence of income statements, profit plans, or business plans. See Dunwoody v. Commissioner, T.C. Memo 1992-721. Although petitioner testified that he was constantly changing his method of operation to reduce expenses, there is no evidence of any changes petitioner made to increase revenue. Factor (2): The Expertise of Taxpayer or His Advisor. Petitioner has had an interest in horses since his childhood days, and this interest is ultimately what motivated petitioner to begin breeding horses. This interest is not necessarily synonymous with expertise in the raising and breeding of Percheron horses. Petitioner did not make a study of the profit potential of raising Percheron horses. Although a formal market study is not required, failure to make *542 the most basic investigation of the factors that affect profit is indicative of the absence of a profit motive. See Underwood v. Commissioner, T.C. Memo. 1989-625. At trial, petitioner testified that he felt he could make a profit on as little as one sale of a Percheron horse. We find it highly unlikely that petitioner could generate a profit on the sale of one horse per year, considering that the most petitioner ever received for one of his Percherons was $ 1,300, nearly one fourth of his foals failed to survive, and the gestation period of a Percheron is 11 months. Petitioner did not have the assistance of competent and experienced partners. There is no evidence that Mr. Langford had any previous experience with Percherons or draft horses. The only experience Mr. Munksgard had with draft horses was as a child on his grandfather's farm before his grandfather purchased a tractor. Factor (3): The Time and Effort Expended by the Taxpayer in Carrying on the Activity. Petitioners spent only a minimal amount of time and effort in managing the horse operation. Both petitioners were employed full time, petitioner as the CEO of a bank and petitioner's *543 spouse as a registered nurse. The fact that the taxpayer may have devoted little time to the activity does not necessarily indicate the lack of a profit motive where the taxpayer employs competent and qualified persons to carry on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. There is no evidence as to the amount of time Mr. Langford devoted to the activity. Mr. Munksgard, petitioner's partner, also devoted little time to the horse breeding activity and the farm. Except for a 5-week period, Mr. Munksgard was otherwise employed full time. Factor (4): Expectation that Assets Used in Activity May Appreciate in Value. Petitioner has not presented evidence that he had expected his Percheron horses to increase in value. Petitioner argues that he expected the value of the horses to appreciate over time, and that the subsequent downturn in the market was unforeseeable. Without even a cursory survey of the market by petitioner, it is difficult to imagine that any expectation by petitioner that his horses would appreciate over time was anything more than a hope. Despite operating losses beginning in 1983, petitioner claimed to have made a net overall profit after the unrealized *544 appreciation in the value of the Bronson farm is taken into account. There is evidence that the Bronson farm did appreciate in value, yet, the evidence does not demonstrate that the appreciation was due to petitioner's breeding activity. To the contrary, the evidence indicates that the appreciation of the Bronson farm, which petitioner is now residing on, was due to the construction of additional structures and the improvement of the fencing. Moreover, the move to the Bronson farm was not planned, but was caused by Mr. Langford's arrest and subsequent incarceration. Golanty v. Commissioner, supra at 429-430. Factor (5): The Success of the Taxpayer in Carrying on Similar or Dissimilar Activities.
Petitioner has not been engaged in any other activities for profit besides his work as president and CEO of Farmers. Factors (6) & (7): The Taxpayer's History of Income or Losses with Respect to the Activity and The Amount of Occasional Profits, If Any, Which Were Earned. Although no one factor is determinative of the taxpayer's intention to make a profit, a record of substantial losses over many years, and the unlikelihood of achieving *545 a profitable operation is highly probative of the taxpayer's true intention. Golanty v. Commissioner, supra at 426-427; sec. 1.183-2(b)(6), Income Tax Regs. Petitioners have yet to earn a profit on their horse breeding activity. Petitioner did not prepare a profit plan for these activities or consult books or persons who were running a profitable enterprise. See Golanty v. Commissioner, supra at 432. The occasional revenue petitioners received from these activities during 1987 and 1988 was de minimis compared to the expenses incurred. See Smith v. Commissioner, T.C. Memo. 1993-140; Gircsis v. Commissioner, T.C. Memo. 1992-244. Clearly, petitioner has not proved a bona fide objective to earn a profit from the horse breeding operation. [3] There was no established market for Percheron horses. *546 Factor (8): Financial Status of the Taxpayer. As petitioner's losses continued to mount so, correspondingly, did petitioner's wage income. No direct economic benefit exists from losing money when the tax savings represent less than 100 percent of the loss. Engdahl v. Commissioner, supra at 670. However, many of the improvements made by petitioners were capital improvements to the Bronson farm on which petitioners now reside. Buildings were built or repaired and fences were installed. Thus, despite the losses, petitioners' substantial income permitted petitioners to continue in their horse breeding activities regardless of the losses while the Government subsidized a portion of their costs. Gircsis v. Commissioner, supra.
Factor (9): Elements of Personal Pleasure. Petitioners contend that there is no evidence of personal pleasure because the breeding and raising of horses is hard, demanding, physical work, and the Bronson farm is devoid of any "recreational" facilities. Petitioners obfuscate the issue. Hard work alone is not enough to establish a profit-seeking objective. Feldman v. Commissioner, T.C. Memo. 1986-287. *547 While the breeding and raising of horses is hard, physical work, it is clear from the facts that petitioner enjoyed this activity and lifestyle. Petitioner grew up on a farm and around horses. He lived in a rural area of Florida. Petitioner testified that since childhood he was interested in raising horses and living on a farm. When Mr. Munksgard left, petitioner moved the old family house on to the Bronson farm so that he could live on his farm and be near his horses. The record before us does not convince us that petitioners engaged in their horse breeding activity with an actual and honest objective of making a profit. Therefore, petitioners are not entitled to take deductions for business expenses and depreciation in excess of income. The second issue is whether petitioners are liable for additions to tax under section 6661 for the years 1987 and 1988. A substantial understatement of tax exists if the taxpayer understates his tax liability by the greater of $ 5,000 or 10 percent of the tax required to be shown on the return for the year in issue. Sec. 6661(b)(1)(A). The deficiencies in petitioners' income tax exceed $ 5,000 for each of the years 1987 and 1988. Consequently, *548 each understatement is a substantial understatement. The understatement may be reduced and the addition to tax accordingly reduced, if the taxpayer's treatment of the item was based on substantial authority or if the relevant facts relating to the treatment were adequately disclosed on the return or statement attached thereto. Sec. 6661(b)(2)(b)(i) and (ii). Petitioners concede there was not adequate disclosure on their returns. Accordingly, the only issue is whether there is substantial authority pursuant to section 6661(b)(2)(B)(i). Petitioners have the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Based on the discussion above, we are convinced that there was not substantial authority for petitioners' position. Respondent's determination of the addition to tax for substantial understatement of liability is sustained. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The Percheron horse is one of the five breeds of draft horses in the United States. A draft horse is a large horse that was originally bred for moving or towing heavy objects. The most commonly known of the breeds is the Clydesdale, the horse used in the Budweiser advertisements. Essentially, the horses are a novelty. The horse is not commonly used as a riding horse because of its size, nearly 6 feet tall and approximately 1,900 pounds. The Percheron's gestation period is 11 months. According to the testimony, at trial, the largest users of draft horses are the Amish.↩
3. Between 1983 and 1989, the average price petitioner received for a Percheron foal was $ 700. At an average price of $ 700, assuming every foal survived, petitioner would have to sell approximately 27 foals per year to generate a profit for the years 1987 and 1988.↩