BENJAMIN H. EWING AND DORIS J. EWING, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ewing v. Commissioner
Docket No. 25322-86.
United States Tax Court
T.C. Memo 1989-104; 1989 Tax Ct. Memo LEXIS 104; 56 T.C.M. (CCH) 1443; T.C.M. (RIA) 89104; March 15, 1989. William D. Harris, for the petitioners. Craig S. *105 Morford, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated June 19, 1986, determined deficiencies in the 1982 and 1983 income taxes of petitioners, Benjamin H. Ewing and Doris J. Ewing, in the respective amounts of $ 21,339.81 and $ 23,481.33. The deficiencies resulted from the disallowance of certain expenses and deductions purportedly associated with petitioners' quarter horse breeding activity. The sole issue presented for our consideration is whether petitioners' quarter horse activity was an "activity not engaged in for profit" within the meaning of section 183. [1]
FINDINGS OF FACT The parties' stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference. Petitioners Benjamin H. Ewing and Doris J. Ewing were husband and wife and resided in Pomeroy, Ohio, at the time they filed the petition commencing this case. Petitioner Benjamin H. Ewing [2] has been a mortician since 1964. He has owned and operated Ewing *106 Funeral Home since 1969, when he inherited it from his father. Petitioner's father acquired the business from petitioner's grandfather. Petitioner has been associated with his family's funeral home business all his life. He was 43 years old at the time of trial. During 1982 and 1983, the years at issue here, petitioner was actively involved in the funeral home business. As funeral director, he ran the business and performed or supervised the performance of all tasks associated with a funeral home. He worked many hours per week and was on call 24 hours a day, 7 days a week. He also employed one other licensed mortician and two other unlicensed individuals. Petitioner applied some formal accounting procedures in the operation of the funeral home. He used a check disbursement journal, record of payroll and a "funeral book." The funeral book contained a sales journal and an accounts receivable ledger. The funeral book recorded, among other things, services rendered, items sold to his clients, the cost of the funerals, the amount of cash received, accounts receivable and how payment was expected to be made. *107 Petitioner's secretary did the daily bookkeeping and accounting and calculated various types of taxes associated with the business. She was responsible for maintaining the funeral home's books and records and forwarding them to petitioners' accountants for preparation of petitioners' income tax returns. From 1980 through 1985, petitioners reported net profit from their funeral home business for Federal income tax purposes as follows: Year
Net Profit
1980
$  58,681.55
1981
116,647.60
1982
112,888.55
1983
82,235.61
1984
68,041.82
1985
43,962.00
In addition to their funeral home business, petitioners had business interests in real estate and oil wells. Petitioner also served as a director of a local bank and he managed a family trust. From 1980 through 1985, petitioners reported income from these activities and sources other than their funeral home business as follows: Year
Income
1980
$  7,848.46
1981
9,889.12
1982
9,309.94
1983
11,310.95
1984
33,944.53
1985
26,532.00
In addition to the funeral home business and the ventures identified above, petitioners and their children, Elizabeth Ann, Kimberly Sue and Benjamin *108 Henry, became interested in and involved with horses. This activity started in 1979 when petitioner received three Arabian horses in exchange for funeral services and when petitioners' children received two horses as Christmas gifts from their godparents. Elizabeth, Kimberly and Benjamin were approximately 8, 5 and 2 years old, respectively, in 1979. Petitioners has no experience or knowledge regarding the horse business when they acquired the horses. Petitioners' interest in horses quickly focused on quarter horses, particularly "youth activity quarter horses." [3] Petitioners began to purchase quarter horses in 1979 and began to breed quarter horses in 1981. Their breeding program, however, was not of great consequence. Petitioners owned mares, but they did not own any stallions to breed with the mares. Consequently, petitioners bred their mares with stallions of others for a fee. Through purchases and breeding, petitioners owned the following quarter horses in 1982 and 1983, the years at issue here: Method of
Acquisition:
Purchase
Gelding [4]
Acquisition
Purchase/
Age at
Price/
Name
Mare
Date
Breeding
Purchase
Stud Fee
Touch of
Class
Gelding
12/20/79
Purchase
6 yrs.
$  4,300
Foxy Lady
Luck
Mare
12/20/79
Purchase
5 yrs.
1,500
Skippy's
Folly
Gelding
4/18/80
Purchase
*
1,600
Tuffy Jo
Jo **
Mare
9/6/80
Purchase
9 yrs.
1,000
Skip 91
Gelding
6/15/81
Purchase
1 yr.
5,500
Cinnamon
Foaled to
Bar Lady
Mare
1/14/82
Foxy Lady Luck
--
200
Flashy
Bar Doll
Mare
1/22/82
Purchase
6 yrs.
23,000
Moravian
Roper
Gelding
10/24/82
Purchase
12 yrs.
5,000
Impressive
Foaled to
DeJavu
Mare
3/24/83
Foxy Lady Luck
--
2,500
Smooth
Coffee
Gelding
5/12/83
Purchase
8 yrs.
12,500
Too Tuff
To Miss
Mare
7/13/83
Purchase
1 yr.
1,500
Long Line
Leo
Gelding
10/26/83
Purchase
8 yrs.
12,000
Span A
Diamond
Gelding
11/12/83
Purchase
4 yrs.
8,000
*109 Date of Sale
or Other
Sale
Name
Disposition
Price
Touch of
Died in
Class
Jan. '83
--
Foxy Lady
Luck
6/25/85
$    500
Skippy's
Folly
*
*
Tuffy Jo
Jo **
Still owned
--
Skip 91
1984
0
Cinnamon
Bar Lady
6/25/85
500
Flashy
Bar Doll
Still owned
--
Moravian
Roper
Still owned
--
Impressive
DeJavu
11/2/86
10,000
Smooth
Coffee
1984
0
Too Tuff
To Miss
6/25/86
300
Long Line
Leo
Still owned
--
Span A
Diamond
10/8/86
1,500
Many of the horses purchased by petitioners had established horse show records at the time of purchase. Long Line Leo competed in over 70 horse shows *110 before being acquired by petitioners. He was the winner of many awards and championships starting from as far back as 1978 when he was a world champion. He was 2 years old in that year. Span A Diamond (which started competing at approximately age 2), Flashy Bar Doll and Smooth Coffee also had established track records. They competed in many horse shows before being acquired by petitioners. Smooth Coffee's horse show activity started in approximately 1978, when he was 2 years old. In addition, Skip 91 was in competition before being purchased by petitioners. At the time of purchase, petitioners believed Skip 91 and Smooth Coffee were completely healthy. Skip 91 later became lame and Smooth Coffee developed navicular disease. Being unable to utilize or sell the horses, petitioners donated them to Ohio State University in 1984 and claimed a charitable contribution deduction of $ 5,500 for Skip 91 and $ 12,500 for Smooth Coffee. Both horses were virtually worthless at the time they were donated. [5]
*111 Along with his quarter horse acquisitions, petitioner has become increasingly more involved in organized horse functions. He has taken seminars regarding horses and has joined various quarter horse organizations and associations. Included are the American Quarter Horse Association, the Ohio Quarter Horse Association, the Southern, Northern and Eastern Ohio Quarter Horse Associations and the Snaffle Bit Association. Petitioner has also held various positions within the Ohio Quarter Horse Association. Since approximately 1986, he has been the director of the youth horse division of the Ohio Quarter Horse Association, one of the largest youth horse organizations. In addition, petitioner has been the assistant show manager of "The Congress," a large and prestigious horse show. Petitioner's involvement in these associations and organizations consumes an average of approximately 3 to 4 days a month. In contrast to their participation in organized horse activities, petitioners were not involved in the day-to-day operation of the horse breeding activity. They put no time or effort into the breeding, training or care of the horses. This was left for their horse trainers and boarders. *112 Consequently, petitioners' primary expense in their horse operation was for boarding, maintaining and training their horses. In 1981, petitioners hired Dan Trein (sometimes referred to as Dan) to provide these services. [6] Dan, a horse trainer and showman, kept petitioners' horses at his stables located in Seville, Ohio. Seville is approximately 4-1/2 hours from petitioners home in Pomeroy, Ohio. From time to time, petitioners did keep some of their horses on land they owned in Pomeroy. Dan charged approximately $ 375 per month for each horse he boarded and trained and $ 125 for each horse he just boarded for petitioners. For 1981, 1982, 1983, 1984, 1985 and 1986, petitioners paid Dan $ 2,972.99, $ 12,707.13, $ 24,173.42, $ 36,499, $ 38,042 and $ 40,945, respectively, for his services. In addition, Dan received all horse show winnings for the horses he had trained, except in futurities, [7] where petitioners received a percentage of any purses. *113 Before attempting to train petitioners' quarter horses, Dan spent 60 to 90 days evaluating the horses. A horse's potential was determined within this period. A decision would then be made on whether the horse could be trained or be worth training. If it was determined that a horse would be trained, the training period would range from 1 to 2 years in order to make the horse competitive for showing. Quarter horses can start to compete when they are as young as 1 or 2 years old. In addition to boarding and training petitioners' horses, Dan advised petitioners on what horses to buy, sell and breed. Dan charged a fee of $ 100 per day plus expenses for this service. In a purchase or sale situation, Dan also received a commission from either the buyer or seller of the horse, depending on which party he was representing in the transaction. Dan advised petitioners that it would be economically advantageous for petitioners to cull their herd by selling off lesser quality horses on an ongoing basis. However, petitioners were reluctant to follow this advice and did not sell any quarter horses between 1979 and 1984. The first quarter horses sold by petitioners were in 1985, when William *114 Harris, the attorney representing petitioners here and the preparer of petitioners' 1985 tax returns, advised them to sell some horses. As part of his fee for training petitioners' horses, Dan trained all of petitioners' children to ride and show horses. Being the oldest child, Elizabeth Ewing (Beth) showed the most interest in this tis activity. Dan worked with Beth extensively and continuously from the start of his association with petitioners. This training took place at Dan's stables and at horse shows where Beth competed. Beth was approximately 11 years old when she started training with Dan in 1981. She was a gifted rider who, from 1981, competed in more than 100 horse shows. Beth competed primarily in youth activity horse events. [8] During 1982 and 1983, Beth competed (many times successfully) with Long Line Leo, Flashy Bar Doll, Smooth Coffee and Moravian Roper. Beth was not the only person to ride petitioners' horses in horse competitions. During 1982 and 1983, Dan and a few of his associates competed with Long *115 Line Leo, Flashy Bar Doll, Smooth Coffee, Moravian Roper and Skip 91. During this period, no other horses belonging to petitioners were exhibited at horse shows by either Beth or anyone else. When Beth or petitioners' horses were competing in horse shows, the entire Ewing family would usually attend. Watching their daughter and horses compete brought personal satisfaction to petitioners. Petitioners reported that from 1980 through 1985 the value of their horses and the income, depreciation, expenses and losses with respect to their horse activity were as follows: Value
Year
of Horses
Income
Depreciation
Expenses
Losses
1980
$  7,300
$     0   $  4,123.00
$  6,695.36 [9] $ ( 10,818.36) 1981
6,600
973.91
5,686.11
10,900.02 ( 15,612.22) 1982
9,600
265.00
8,305.00
[10] 44,462.50 ( 52,502.50) 1983
37,600
1,712.85
16,382.00
[11] 62,465.67 ( 77,134.82) 1984
71,600
2,342.61
20,715.53
86,936.85 (105,309.72) 1985
52,800
3,906.00
11,713.00
50,934.00 ( 58,741.00) 1986
23,546
NE   NE    [12] 40,945.00+
NE     *116 "NE" indicates that no evidence was presented. Petitioners did not operate their horse activity as a traditional business. During 1980, 1981, 1982 and part of 1983, petitioners did not maintain a separate checking account or any other formal books and records regarding their horse activity. During this period, all expenses associated with the horse activity were paid from petitioners' personal checking account. Furthermore, if any funds were generated from the horse operation, they were deposited in petitioners' personal bank accounts. It was not until April of 1983 that petitioners opened a separate checking account for their horse activity. Even then, petitioners continued to commingle show horse activity funds with other unrelated funds. Petitioners retained some invoices, their personal checkbook register and some canceled checks regarding their horse operation. These records and petitioners' memory were the means used to assist their accountants in preparing petitioners' tax returns and to substantiate their tax deductions. Other than these records, petitioners did not maintain any books or records to keep track of what horses they owned, when they acquired them, what *117 was paid for them, what was spent for boarding, training and showing the horses, what was spent for other expenses associated with the horses, what they sold the horses for and whether they realized a profit or loss from the sale of any particular horse. Even with the records that were kept, they could not tell whether a horse was sold at a profit or a loss or at what price a horse would have to be sold to recognize a profit. Petitioners' accountants had continuously advised petitioners to improve their record keeping practices. Petitioners never devised a profit plan for their horse operation. They did not have a targeted year for making a profit, and did not make profit projections. Petitioners did not advertise any aspect of their horse activity in any books, periodicals or any other written or printed materials during the years at issue. [13]
OPINION The only issue for our consideration is whether petitioners' horse operation was an activity *118 not engaged in for profit. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. [14] An "activity not engaged in for profit" is defined by section 183(c) as: any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [relating to trade or business expenses] or under paragraph (1) or (2) of section 212 [relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income]. *119 Thus, section 183 does not apply if petitioners' activity gives rise to deductions under section 162 or under section 212(1) or (2). Deductions are permitted under those sections if an activity is commenced and continued with the "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioners need not, however, establish that they had a "reasonable" expectation of profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. Whether petitioners had the requisite intent is an issue of fact to be resolved on the basis of all surrounding circumstances. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. Greater weight is given to objective factors *120 than to petitioners' statements of intent. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. The Income Tax Regulations, section 1.183-2(b), provide nine nonexclusive factors to be considered in determining petitioners' intent. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling, and all facts and circumstances, including factors not listed, are to be considered. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986). The regulations also state that "A change of operating methods, * * * or abandonment *121 of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs.
Taxpayers who breed and raise horses for sale may possess an actual and honest objective of making a profit. See, e.g., Engdahl v. Commissioner, supra. However, the facts of this case indicate petitioners did not have the requisite profit objective in their horse operation. 1. The Manner in Which Petitioners Carried on Their Horse Activity
Petitioners did not maintain complete and accurate books and records for their horse activity. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners did not keep a ledger or other adequate records where they could post what horses they owned, when they acquired them, what was paid for them, what was spent for expenses associated with the horses, what income was earned, what they sold the horses for and whether petitioners realized a profit or loss from the sale of any particular horse. Although petitioners kept some invoices, their personal checkbook register and some canceled checks, they did not present any records and had no knowledge regarding whether any horses *122 were sold at a profit or loss, at what price a horse would have to be sold to recognize a profit or, more importantly, what amount of income would be needed to make the operation profitable as a whole. Furthermore, petitioners presented no evidence that they maintained any records for purposes of assessing the overall performance of the operation. Golanty v. Commissioner, supra at 430. Apparently, petitioners retained the minimum records necessary for their accountants to prepare their tax returns. Petitioners concede that their record system was deficient, but argue that the bookkeeping methods used in their horse activity were consistent with the bookkeeping methods used in the funeral business, an activity which has not been attacked by respondent on the basis of petitioners' profit objective. The evidence, however, does not support petitioners' argument. Unlike the horse activity, petitioners did maintain some formal books and records regarding the funeral home business. They maintained a funeral book which contained a sales journal and an accounts receivable ledger. With these records, petitioners knew if a profit was generated from the sale of goods and *123 the performance of particular services. Moreover, petitioner had an employee to do the daily bookkeeping and accounting for the funeral business. Thus, petitioners did not conduct their horse activity in a manner substantially similar to their funeral business. Sec. 1.183-2(b)(1), Income Tax Regs.
The record further demonstrates that petitioners did not have a profit plan for their horse operation. Sec. 1.183-2(b)(1), Income Tax Regs. They did not target a particular year in which they planned or even hoped to make a profit. In fact, petitioner testified with respect to this issue as follows: "I don't know whether I even thought about [when, if ever, I would make a profit]." There must be some point where a continuously unprofitable venture will be abandoned by a profit-minded individual. Petitioners, again, argue that not having a profit plan is consistent with the manner in which they conducted their funeral business. This argument, however, is not very persuasive. Unlike the horse operation, petitioner was involved in the funeral home business all his life and has operated the business since 1969. The business was in his family for at least three generations and had *124 a proven track record. Petitioners further contend that they were looking to realize profits from the sale of their quarter horses. However, petitioners admittedly did not advertise their operation or the availability of their horses in trade magazines, journals or other publications as one would expect from individuals possessing a dedicated intent to make a profit from the sale of horses. Petitioners argue that the means by which they advertised their horses was by exhibiting them in horse shows. They further contend that they showed their horses in order to increase the value of the offspring produced from the show horses. Although under some circumstances exhibiting horses in horse shows will be an honest attempt to advertise one's horses, Engdahl v. Commissioner, supra at 667, petitioners' participation in horse shows does not appear to be such a case. The horses petitioners exhibited were never sold and there was no evidence presented that they were ever for sale. Further, only one of the horses exhibited was of the type that could produce offspring for sale. The record discloses that the following five horses were exhibited by petitioners at horse shows *125 in 1982 and 1983: Long Line Leo; Flashy Bar Doll; Smooth Coffee; Moravian Roper; and Skip 91. Long Line Leo, Flashy Bar Doll and Moravian Roper are still owned by petitioners, and Smooth Coffee and Skip 91 were donated by petitioners only after they became ill. [15] Moreover, all of these five show horses, except Flashy Bar Doll, were geldings. In other words, they could not breed. Hence, petitioners' claim that they advertised their horses for sale by exhibiting them is unsupported by the facts and is, therefore, without merit. Petitioners have also failed to establish that they changed their operating methods or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs. In fact, the evidence indicates that petitioners maintained unprofitable methods habitually. Throughout the years in which the horse activity was operated, one of the largest expenses incurred by petitioners in their horse activity was the fee paid to Dan Trein. During the years at issue and up until 1985 petitioners did not cull their herd to eliminate their lesser quality quarter horses, even *126 after being advised by Dan to do so. Petitioners opted to pay Dan for the boarding and care of these horses despite the fact that the fee for these services was greater than the value of the horses. These actions and the overall manner in which petitioners carried on their horse activity indicate they did not have the requisite profit motive. 2. The Expertise of Petitioners and Their Advisors and the Time and Effort Expended by Petitioners in Carrying on Their Horse Activity
Petitioners, admittedly, had no expertise or knowledge regarding the breeding, caring, showing and sale of horses. Moreover, unlike the funeral home business, petitioners expended virtually no time and effort in their horse operation, including making business decisions. They argue, however, that the hiring of Dan Trein is indicative of the existence of a profit motive. Sec. 1.183-2(b)(2) and (3). We disagree. Petitioners did not present any credible evidence that Dan was hired to perform his duties with an objective of realizing a profit for petitioners. In fact, Dan's business interests conflicted with any business interests of petitioners, assuming such interests existed. Dan worked on a commission *127 basis when petitioners purchased or sold a horse. Furthermore, Dan did not always represent petitioners in these transactions. At times, he represented parties purchasing from or selling to petitioners. Under such an arrangement, Dan may not have had petitioners' interests in mind, and understandably so. Moreover, there was no evidence presented that Dan, or anyone else for that matter (including petitioners), was hired or responsible for making day-to-day "business" decisions with a profit objective in mind. In addition, advice that was given by Dan to improve the profitability of petitioners' horse operation was ignored. When Dan recommended that petitioners cull their herd to improve their horse activity economically, petitioners ignored this recommendation. "Where a taxpayer * * * procures * * * advice, but does not carry on the activity in accordance with such [advice], a lack of intent to derive profit may be indicated * * *." Sec. 1.183-2(b)(2), Income Tax Regs.
Petitioners did not sell any quarter horses until 1985 when their tax attorney advised them to do so. [16] Although the record does not clearly disclose the reason for this recommendation, we believe that this *128 advice and the sales by petitioners were likely to have been tax motivated, not profit motivated. There was no indication that petitioners' attorney had any knowledge regarding horses or the horse business. However, in evaluating whether horse activities are profit oriented, one point of examination by the Internal Revenue Service and this Court has been whether taxpayers have culled their herds in order to eliminate unprofitable horses. See, e.g., sec. 1.183-2(b), Income Tax Regs.; Engdahl v. Commissioner, supra.
Petitioners claim that the reason no quarter horses were sold before 1985, despite Dan's recommendation, was because the horses were "babies." However, the record discloses that the majority of petitioners' horses were older horses with proven performance histories. Hence, the hiring of Dan Trein does not assist petitioners in establishing a profit objective. In fact, the circumstances of Dan's *129 employment are further proof of petitioners' lack of profit intent. Petitioners argue that although they were not involved in the day-to-day operation of their horse activity, petitioner was extensively involved in various horse shows, associations and organizations. We conclude that petitioner's participation in these organizations was not business and profit motivated. Involvement in the horse associations brought prestige and great pleasure to petitioner. We conclude that this was the overriding motivation for petitioner's involvement in these horse organizations and functions. Any business-related benefit gained by petitioner as a result of his participation in these organizations was purely incidental. 3. Petitioners' Expectation That Their Horses Would Appreciate in Value
Petitioners next argue that they had an expectation that their horses would appreciate in value, thereby producing a profit when sold. Sec. 1.183-2(b)(4), Income Tax Regs. Under the circumstances, it is hard to believe that petitioners had such an expectation. At the time petitioners purchased the horses that they owned during 1982 and 1983, at least 8 out of 11 horses purchased ranged from *130 4 to 12 years old. Many of these had established show records at the time of purchase. Petitioners did not establish that relatively older horses with known potential and quality could appreciate. In fact, every one of these horses that was later sold by petitioners was sold for an amount significantly less than the amount for which they were purchased. We conclude that the motive behind petitioners' purchase of mature and proven horses was not to make a profit on their resale, but to provide such horses for their children to compete with and ride. Moreover, petitioners' claim that they expected to make a profit from breeding and selling the offspring is unpersuasive. The operation's horse breeding capability was severely limited since the majority of petitioners' horse inventory in 1982 and 1983 consisted of geldings. In addition, even the horses that petitioners acquired through breeding were apparently not produced from high quality horses, thereby decreasing the likelihood of producing high quality and valuable offspring that could be sold at a profit. Petitioner and Dan testified that, in breeding horses, the quality, traits and bloodline of the parent horses are extremely *131 important. The caliber of the parent horses greatly determines the quality, traits and, in many respects, the value of their offspring. Breeding two horses together with the desired traits and qualities substantially increases the probability of developing a horse with similar traits and rank. Thus, according to petitioner and Dan, it is unlikely that a "quality" horse will succeed from "poor quality" horses. Dan further testified that the value of a youth activity quarter horse with distinction and a high quality bloodline was approximately $ 20,000 during the years at issue and the stud fee for such a horse was approximately $ 2,500, at a minimum. Dan had the opinion that although horses commanding these prices and fees are not rarities, they are far from being bountiful. Out of a herd of 15 quarter horses, one can only expect an average of approximately 1 or 2 horses of this caliber. In 1982, petitioners had Cinnamon Bar Lady foaled to Foxy Lady Luck. Petitioners paid a stud fee of $ 200 to breed Foxy Lady Luck. Comparing this relatively low stud fee to the fee for a high quality stud (about $ 2,500), indicates that Foxy Lady Luck's mate was more likely of low quality. *132 Moreover, the $ 1,500 purchase price of Foxy Lady Luck indicates that she was not of a high quality either. The only other foal that petitioners had in 1982 or 1983 was Impressive De Javu, for which they paid a large stud fee and was the only horse sold for more than the acquisition price. This, again, seems the exception rather than the rule. In addition, even though Impressive De Javu was sold for more than the stud fee, petitioners could not tell whether a profit was realized after taking into account the horse's expenses. Since petitioners' inventory consisted of mostly geldings and since petitioners were using low quality horses for the minimal breeding they did do, one could not expect that their breeding operation would be profitable, particularly when the expenses for caring, training and boarding their entire inventory are considered. This conclusion is further supported when the odds of developing a high quality and profitable horse are taken into consideration. This is another indication that in 1982 and 1983 petitioners did not have the objective of realizing a profit from the sale of their horses. 4. The Horse Activities' History of Income, Profits and Losses *133 and Petitioners' Financial Status
Petitioners' horse activity has incurred substantial losses in every year for which evidence was presented. Sec. 1.183-2(b)(6), (7) and (8), Income Tax Regs. This resulted from realizing nominal income while at the same time incurring substantial expenses in maintaining relatively low value horses. Petitioners' continuous outlay of money in excess of the value of their horse inventory is, under the circumstances, not indicative of an intent to make a profit. There is also no indication the activity will become profitable, sufficient to recoup the losses which have been sustained in the past. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Moreover, the fact that these losses -- which at times consisted of phantom business expenses -- were used to offset substantial income from petitioners' other ventures indicates that petitioners attempted to make the Federal treasury an involuntary and unsuspecting partner in their family's equestrian hobby. Substantial income from sources other than the activity (particularly if the *134 losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. [Sec. 1.183-2(b)(8), Income Tax Regs. Emphasis added.] See also Golanty v. Commissioner, supra at 429. 5. The Presence of Elements of Personal Pleasure and Recreation
Finally, although not vital in and of itself, petitioners' horse activity contained elements of personal pleasure and recreation. Sec. 1.18302(b)(9), Income Tax Regs. Petitioners contend that since the horses were kept at Dan's stables, approximately 4 hours away from their residence, there could not be any personal pleasure or recreation involved. However, petitioners did keep some horses on land they owned in their hometown. We have further found through Dan's testimony that petitioners' children in fact rode the horses extensively at Dan's stables and at horse shows. Moreover, as part of the fee paid and deducted by petitioners for the training and caring of their horses, petitioners' children were being trained to ride by Dan. Petitioners argue that their children rode the horses at shows *135 because that was a requirement for campaigning youth activity horses, one of the major areas of petitioners' business. We conclude, however, that petitioners were involved with youth activity horses because their children were youths, not because there was a profit to be made from the sale of these types of horses. In addition, petitioners have admitted that their entire family went to the horse shows where their children and horses were competing. Admiring their children and horses while competing gave petitioners' great personal satisfaction. It is also clear that petitioner's involvement in horse shows, horse associations and organizations has not only brought him pleasure, but has also brought him prestige. The presence of personal motives in the carrying on of petitioners' horse operation, along with the factors discussed above, indicates that petitioners did not have an actual and honest objective of making a profit. Accordingly, after considering the record as a whole, we find that petitioners' quarter horse activity was not engaged in for profit during the taxable years 1982 and 1983. Therefore, we hold that section 183 applies and losses claimed by petitioners with *136 respect to their horse activity shall be allowed only as provided in section 183(b). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue.↩
2. Petitioner in the singular will refer to Benjamin H. Ewing.↩
3. As its name implies, a youth activity horse is specifically bred and trained with the intent of being ridden by young individuals, 18 years old or younger. These horses are, therefore, bred from gentle, mature and obedient horses. ↩
4. A gelding is a male horse that has been neutered and as a result, cannot be used for breeding purposes.↩
*. The age and disposition of Skippy's Folly are not clear from the record. ↩
**. Tuffy Jo Jo was not a registered quarter horse. ↩
5. Although petitioner testified that Smooth Coffee's illness rendered it virtually worthless and that it was, therefore, donated, Smooth Coffee's show record reveals that it successfully competed in numerous horse shows after being donated. The parties did not address this apparent discrepancy.↩
6. Petitioners used two other trainers before hiring Dan.↩
7. A futurity is a horse show where horses are entered as competitors at or before their birth. The amount of the entry fees collected from the owners or breeders determines the amount of the purses.↩
8. In such events, the rider must be 18 years old or younger and must be listed as the owner of the horse or must be a member of the owner's family.↩
9. Petitioners reported and utilized their 1980 loss although they admit they were not in the horse business in that year. ↩
10. Approximately $ 10,000 of these expenses were identified as travel expenses. However, only half of the travel expenses were actually expended for travel directly related to the horse activity. The remainder was expended for personal items that were not related to the horse activity, including expenses incurred during a family vacation to Myrtle Beach, South Carolina, and the cost of a toy train set. ↩
11. Petitioners reported travel expenses of $ 11,053.99 that purportedly were incurred in their horse activity. However, only $ 9,323.14 was actually expended for travel related to the horse activity. The remainder was expended for personal items that were not related to the horse activity. ↩
12. The record does not disclose the total amount of expenses reported by petitioners for 1986. However, the fee paid to Dan for boarding and training petitioners' horses was $ 40,945.00.↩
13. Although petitioners testified they did not formally advertise their horses or their horse operation, they reported and deducted advertising expenses for their horse activity in their 1982, 1983, 1984 and 1985 tax returns.↩
14. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
15. But see footnote 5, supra.↩
16. Some evidence was presented that Skippy's Folly may have been sold between 1981 and 1983 for $ 3,000. Petitioners never received any money for the horse upon disposition. Even if petitioners sold the horse, it would be the exception and not the rule.↩