ABDOLVAHAB S. and JEAN D. PIRNIA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pirnia v. Commissioner
Docket No. 14523-87
United States Tax Court
T.C. Memo 1989-627; 1989 Tax Ct. Memo LEXIS 627; 58 T.C.M. (CCH) 740; T.C.M. (RIA) 89627; November 27, 1989
Thomas A. Baldwin, for the petitioners. Jeffrey L. Bassin, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By notice of deficiency dated February 23, 1987, respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1982 in the amount of $ 14,747. *629 After concessions, the remaining issue for decision is whether petitioner Jean D. Pirnia's show horse activity was engaged in for profit during taxable year 1982 within the meaning of section 183(a). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated by this reference. Petitioners Dr. Abdolvahab S. and Jean D. Pirnia resided in Dayton, Ohio, when they filed their petition. Petitioners were married and filed a joint Federal income tax return for 1982, but are now divorced. During 1982, Dr. Pirnia's net income from his medical practice, petitioners' only source of income, was $ 95,005.67. In September of 1980, petitioner (all references to petitioner are to Jean D. Pirnia) began taking riding lessons at Bonnie Brooke Farms, located in Dayton, Ohio. Petitioner had little prior experience with horses and had never owned one. Joe and Bonnie McCurry, the owners of Bonnie Brooke *630 Farms, encouraged petitioner to buy a high-caliber horse which could be trained as a show horse and resold at a profit. Over a period of several months petitioner examined several horses and consulted with various show horse owners and breeders. In April of 1981, petitioner bought Denmark, a 5-year-old gelding, from Bonnie Brooke Farms for $ 8,000. A 5-year-old horse is considered young for show purposes. Denmark had good blood lines and came from well-respected breeders. Prior to her purchase of Denmark, Joe McCurry assured petitioner that the horse could be sold at a profit within six months and would double or triple in value within a year. Petitioner relied on McCurry's assurances in purchasing Denmark. Several years later petitioner learned that McCurry had purchased Denmark for $ 2,000 shortly before he sold it to her. During the time petitioner owned Denmark she rode the horse only 3 times. Denmark was trained and shown by Joe McCurry from the date of purchase until the fall of 1983. Despite performing poorly at most showings, Denmark won several small cash prizes during 1982. During 1982, 1983, and 1984, petitioner continually tried to sell Denmark. Her efforts *631 included advertising Denmark in horse periodicals and putting him through an auction. Her efforts were unsuccessful. In March of 1982, petitioner bought a mare, Country Madam, for $ 25,000. The seller was Jim Aikman, one of the foremost breeders of saddlebreds in the United States and president of the Saddlebred Association. Country Madam was sired by Wild Country, an Aikman horse whose foals commanded high prices. Joe McCurry, who served as broker and received a commission on the sale, convinced petitioner that she could resell Country Madam for $ 50,000 within 6 months. Petitioner relied on McCurry's assurances in deciding to invest in Country Madam. Petitioner and McCurry entered into a partnership with the understanding that McCurry would pay the training expenses and share in the profits when Country Madam was sold. After repeated poor results in showings, petitioner decided the fault lay with the trainer rather than the horse. She paid McCurry $ 7,500 to dissolve the partnership and moved Country Madam to a Kentucky horse farm owned by Don Harris, who informed her that the horse was worth no more than $ 15,000. After evaluating the horse, Harris, who generally trained *632 horses worth $ 100,000 to $ 1,000,000, informed petitioner that Country Madam was not of high enough quality to justify his training fees. He recommended that she transfer the horse to the Close Stable in Louisville, which dealt in lower quality horses, in order to more successfully market Country Madam. In February 1984, petitioner moved Country Madam and Denmark to the Close Stable where Denmark was shown fairly successfully. However, petitioner still could not find a buyer for the horse. During 1982 petitioner spent 20 hours a week at Bonnie Brooke Farms learning about horse training, breeding, feeding, tack care, and grooming. Because she had two young children to care for, petitioner could not devote all her attention to the activity. She subscribed to eight different periodicals and journals on horse showing and breeding, and became a member of the Tri-State Saddlebred Association, the American Saddlebred Association, and the United Professional Horse Association. Petitioner maintained detailed records which included all expenditures for each individual horse. In February of 1983, petitioner opened a separate checking account for the show horse activity. In the spring *633 of 1983, approximately two years after beginning her show horse activities, petitioner changed the focus of her business from raising show horses to horse breeding. Rather than training horses for resale, petitioner intended to sell the foals produced by her broodmares. Because she would no longer incur expenses for training and showing the horses, petitioner thought the breeding activity would be profitable. Petitioner attended seminars, conventions, auctions, and actively solicited the advice of experts to educate herself in the field of horse breeding. She devoted an average of 25 hours each week to her horse breeding activity. Petitioner delivered a foal, cleaned stalls, and learned to perform other functions essential to a breeding operation. Petitioner had all mares examined by a veterinarian prior to purchase. However, two of her brood mares, Country Madam and Stardust, developed pseudomonas infections which resulted in aborted foals. There were four unsuccessful foalings as a result of the pseudomonas infections. Because the mares did not produce as many foals as petitioner had originally estimated, the breeding activity was unprofitable. Petitioner considered purchasing *634 a horse farm in order to expand her breeding activity. In 1985 she came close to purchasing Crabtree Farm in Louisville, Kentucky. Petitioner also searched for a suitable property near her home in Dayton. After discussing the matter with various horse farm owners, she decided that because she could not devote all of her time to breeding horses the chances of making a profit on a farm were slim, and therefore she did not purchase a property. Petitioner occasionally rode one of her brood mares, Princess, in order to exercise the horse. She never rode the other mares (Country Madam, Stardust, Never Never, and Noon Time Affair), nor did she allow her children to ride them. Within a few weeks of petitioners' separation in 1986, petitioner sold all remaining horses to a friend who owned a horse farm. Petitioner's purchases and sales of horses were as follows: Horse
Date Acquired
Purchase Price
Date Sold
Sales Price
Denmark
4/81
$ 8,000 1/85
$ 5,000
Country Madam
3/82
25,000
4/86
4,000
Princess
4/83
9,000
4/86
1,000
Never Never
3/84
Princess' foal
4/86
1,500
Stardust
2/85
7,200
4/86
1,000
Noon Time Affair
7/85
Country Madam's foal
4/86
2,500
*635 The income and expenses of petitioner's show horse and breeding activity were as follows: Gain (Loss)
Total Farm Out-of-
from
Other
Income Pocket
Depreci-
Year
Horse Sales
Income
(Loss) Expenses
ation
1981
-0-   -0- -0-   $  3,483.00
$  1,314.00
1982
-0-   $ 250.33
$  250.33 8,424.35
5,887.74
1983
-0-   328.50
328.50 25,972.13
8,823.07
1984
-0-   395.00
395.00 27,450.00
9,172.00
1985
$ 2,576.00 -0- 2,576.00 18,813.94
8,480.00
1986
(5,316.00)
-0- (5,316.00)
6,298.81
-0-  ($ 2,740.00)
$ 973.83
($ 1,766.17)
$ 90,442.23
$ 33,676.81 Total
Net Gain Farm
or
Year Expenses
(Loss)
1981
$   4,797.00
($ 4,797.00)
1982
14,312.09
( 14,061.76)
1983
34,795.20
( 34,466.70)
1984
36,622.00
( 36,227.00)
1985
27,293.94
( 24,717.94)
1986
6,298.81
( 11,614.81)
$ 124,119.04
($ 125,885.21)
OPINION Respondent asserts that section 183 disallows all deductions attributable to petitioner's show horse activity. Section 183(a) supplies the general rule which disallows all deductions attributable to activities "not *636 engaged in for profit." Section 183(b)(1) then allows those deductions otherwise allowable regardless of profit objective, e.g., interest, State and local taxes. In addition, section 183(b)(2) allows those deductions which would have been allowable had the activity been engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). Respondent argues that petitioner's show horse activity was "not engaged in for profit" and that, therefore, deductions taken by petitioners for taxable year 1982 which are attributable to such activity must be disallowed to the extent they exceed gross income from the activity. Petitioner replies that she commenced and continued her show horse activity with the requisite profit objective. Thus, petitioner argues, section 183 is inapplicable, and the deductions attributable to the show horse activity are fully deductible under section 162. We must decide whether section 183 applies to petitioner's show horse activity. Section 183(c) defines an activity which is "not engaged in for *637 profit" as, "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Thus, section 183 does not apply if petitioner's activity gives rise to deductions under section 162 or under section 212(1) or (2). Deductions are permitted under those sections if an activity is commenced and continued with the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioner needs not, however, establish that she had a "reasonable" expectation of profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. Whether petitioner had the requisite objective is *638 an issue of fact to be resolved on the basis of all surrounding circumstances. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. In making our determination, we give greater weight to objective factors than to petitioner's statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other *639 similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). In applying these factors to the instant case we attach great weight to petitioner's testimony, and the documentary evidence she introduced in support of her testimony, which was credible, unimpeached, and uncontradicted by any evidence offered by respondent. We first consider whether petitioner conducted her show horse activity in a businesslike manner; we find she did. Although petitioner did not maintain a separate checking account for her show horse activity during the year at issue, she opened a separate account in February of the following year. In *640 addition, petitioner maintained detailed records of her show horse activity. The maintenance of complete and accurate books and records indicates that an activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Further, petitioner discontinued her show horse activities and began breeding horses when she realized that the show horse activity would never be profitable. Discontinuation of an unprofitable branch of operations indicates a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs.
The second factor to be considered is the expertise of petitioner or her advisors. Petitioner went to great lengths to develop a degree of expertise in horse showing. Although petitioner had little prior experience with horses, she sought the advice of persons knowledgeable about show horse operations. In furtherance of her horse showing activities, petitioner read books, subscribed to various periodicals, and attended seminars and clinics *641 related to horse showing. She also consulted regularly with a veterinarian. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with those who are expert therein, indicates that the taxpayer entered into the activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs.
We next examine the amount of time and effort petitioner devoted to her show horse activity. Petitioner devoted 20 to 25 hours a week to the activity. She had no outside employment other than her show horse activity. Petitioner could not devote all of her time to the activity because she had two young children to care for. However, the fact that petitioner devoted a limited amount of time to the activity does not necessarily indicate a lack of profit objective where petitioner employs competent and qualified persons to carry on such activity. Sec. 1.183-2(b)(3), Income Tax Regs. During 1982 petitioner employed *642 Joe McCurry to assist in training and showing the horses. She also consulted regularly with a veterinarian. Because petitioner employed "competent and qualified persons" to assist her in the operation of the activity, the limited amount of time she devoted to the activity does not weigh against her. We next consider whether petitioner expected that the horses she purchased would increase in value. Petitioner expected the first horse she purchased, Denmark, to double in value within six months. She expected the second horse she purchased, Country Madam, to triple in value within a year. In developing these expectations petitioner relied on the representations of Joe and Bonnie McCurry, both of whom were knowledgable in the show horse business. Petitioner, who had never owned a horse, was totally unaware that the McCurrys were taking advantage of her inexperience. Because petitioner paid highly inflated prices for the horses, they were ultimately sold at a loss. However, petitioner purchased and trained the horses with the expectation that they would increase in value. Prior experience in similar or dissimilar activities is also to be considered. The fact that the taxpayer *643 has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that she is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner had no prior experience with horse showing activities. However, while prior experience may indicate that a taxpayer is engaged in an activity for profit, the lack of such experience does not necessarily indicate that the activity was not engaged in with the objective of making a profit. Sec. 1.183-2(b)(5). We find that petitioner's inexperience in horse showing prior to engaging in the activity is not a significant factor in the instant case. A history of losses may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, the objective to make a profit may exist even in the face of a history of losses unaccompanied by any gains. *644 Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); White v. Commissioner, 23 T.C. 90 (1954), affd. 227 F.2d 779 (6th Cir. 1955). This is particularly true when such losses occur in the formative years of a business, especially one involving horses. Bessenyey v. Commissioner, supra.The start-up phase of an American saddlebred breeding operation is 5 to 10 years. Engdahl v. Commissioner, supra.Relying on the representations of Joe McCurry, a successful professional horse trainer, petitioner expected to make a profit on her show horse activity within a year. She shifted her focus to breeding when her expectations proved unrealistic. We find that the show horse activity's history of losses does not indicate that the activity was not engaged in for profit in the instant case. We next consider whether, and to what extent, petitioner derived occasional profits from the activity. Other than occasional small cash awards, the show horse activity produced no income. However, *645 an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though only losses are generated. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner believed she could double or triple her investment in Denmark and Country Madam within a year of purchasing them. Because petitioner entered into the show horse activity with the objective of earning a substantial ultimate profit, we find that the failure to make occasional profits is not a significant factor in the instant case. We next consider petitioners' income from other sources. Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved. Sec. 1.183- 2(b)(8), Income Tax Regs. While petitioners had substantial income during 1982 from Dr. Pirnia's medical practice, petitioner could not rely upon his continued support due to marital difficulties. Other than Dr. Pirnia, petitioner's only potential source of income was her show horse activity. Given her tenuous marital status, *646 we think it unlikely that petitioner would embark on a hobby costing thousands of dollars and entailing much personal labor without a profit objective. See Engdahl v. Commissioner, supra at 670. Finally, we consider whether personal pleasure or recreation was involved in the activity. Petitioner acknowledged that she enjoyed her show horse activity. However, she rarely rode any of her horses for pleasure, and did not allow her children to ride the horses. Prior to engaging in her show horse activity petitioner had never owned a horse. There is no evidence in the record that petitioner had ever shown or trained horses as a hobby. The fact that petitioner derived personal pleasure from watching her horses perform is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is, in fact, engaged in for profit as evidenced by other factors. Sec. 1.183-2(b)(9), Income Tax Regs.
After consideration of the record as a whole, we conclude that during 1982 petitioner engaged in her show horse activity *647 with an actual and honest objective of making a profit, and petitioners are therefore entitled to deduct the expenses attributable to the activity pursuant to section 162. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩