GERALD EUGENE AND MARILYN SWAFFAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swaffar v. Commissioner
Docket No. 2517-90.
United States Tax Court
T.C. Memo 1992-180; 1992 Tax Ct. Memo LEXIS 188; 63 T.C.M. (CCH) 2561; March 25, 1992, Filed *188 Decision will be entered under Rule 155 Gerald Eugene Swaffar, pro se. Gregory Arnold, for respondent. DAWSON, NAMEROFF
DAWSON
MEMORANDUM OPINION DAWSON, Judge. This case was assigned to Special Trial Judge Larry L. Nameroff pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE NAMEROFF, Special Trial Judge: Respondent determined a deficiency of $ 8,075 in petitioners' Federal income tax for 1986. In addition, respondent determined additions to tax under section 6651(a)(1) in the amount of $ 803.70, section 6661(a) in the amount of $ 2,018.75, section 6653(a)(1)(A) in the amount of $ 662.30, and section 6653(a)(1)(B) in the amount of 50 percent of the interest due on the portion *189 of the deficiency attributable to negligence. The issues for decision are: (1) Whether petitioners are entitled to any interest deductions for home mortgage and credit cards; (2) whether petitioners' Amway activity was engaged in for profit under section 183; (3) if the Amway activity was engaged in for profit, whether petitioners can substantiate claimed business expenses; (4) whether petitioners are liable for additions to tax for negligence under sections 6653(a)(1)(A) and (B); (5) whether petitioners are liable for an addition to tax for late filing under section 6651(a)(1); and (6) whether petitioners are liable for an addition to tax for substantial understatement of income tax under section 6661(a). Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed in this case, petitioners resided in La Palma, California. Except as otherwise noted, petitioners bear the burden of showing that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). For clarity and convenience we are combining our *190 findings of fact and opinion as to each issue. 1. Interest Deductions
In the early part of 1983, Gerald Eugene Swaffar (petitioner) and Mrs. Swaffar lost their home by bank foreclosure. They attempted to buy another home, but could not obtain a loan. During this time, Dennis Schechinger (Schechinger), petitioner's friend from college, informed petitioners of a home located at 4502 Amberwood, La Palma, California 90623 (Amberwood), on which he held a second deed of trust and on which he was in the process of foreclosing. Petitioners and Schechinger entered into an arrangement, which petitioners considered to be a purchase, whereby petitioners would live at Amberwood, fix it up, and make monthly payments, with the intention of eventually sharing equally in any future profits upon its sale. To memorialize this arrangement, petitioners and Schechinger executed two documents called a cotenancy agreement and a lease agreement, on July 23, 1983, and July 27, 1983, respectively. The parties stipulated various documents "relating to the Amberwood house". In relevant part, the cotenancy agreement provided as follows: 1. Term of Agreement
The term of this Agreement *191 shall be for a period of (60) SIXTY months, unless otherwise agreed upon. 2. Value of Property
The value of said property is agreed to be ($ 145,000.00) ONE HUNDRED AND FORTY FIVE THOUSAND DOLLARS. 3. Investor's Investment
The INVESTOR'S [Schechinger's] investment, including closing costs, on such property (shall be) contributed by INVESTOR and title to such property (shall be) taken in his name, subject to required financing and security documents. INVESTOR shall convey to BUYER [petitioners] an undivided one-half interest in such property, conditioned upon full compliance to BUYER with all the terms of this Agreement. INVESTOR'S investment is ($ 16,300.00) SIXTEEN THOUSAND AND THREE HUNDRED DOLLARS. 4. CONSIDERATION FOR THE CONDITIONS OF BUYER'S PURCHASE OF ONE-HALF INTEREST
(a) INVESTOR will execute a grant deed to BUYER for an undivided one-half interest in said property upon the acceptance and agreement by the BUYER to the following terms and conditions of this Agreement and the integrated lease agreement. BUYER shall execute a Quit Claim Deed in favor of the INVESTOR, which will be held unrecorded by DENNIS H. SCHECHINGER *192 as Trustee. In the event that BUYER is in arrears sixty (60) days or longer on any payments, as set forth in subparagraph (c) of this paragraph 4, and provided that INVESTOR or INVESTOR'S designee has filed a Notice of Default upon BUYER in writing, Trustee is instructed to record the Quit Claim Deed from BUYER and BUYER, at the option of the INVESTOR, shall be deemed a month-to-month tenant under all the terms of the lease provisions of this Agreement and is liable for all payments due to INVESTOR or INVESTOR'S designee until the lease term is expired. (b) BUYER acknowledges that his one-half interest in the property is subject to note(s) and Deed(s) of Trust securing said property in the amount of ($ 128,700.00) ONE HUNDRED AND TWENTY EIGHT THOUSAND SEVEN HUNDRED DOLLARS plus any and all contributions made by BUYER [2] now or before.
The above terms were set forth on pages one and *193 two of the cotenancy agreement. Attached thereto, and numbered page 3A, was the following table (presumably intended to represent subparagraph (c), as referenced above): GRADUATED PAYMENTS
MONTHLY PAYMENTS
P & I
PMI
TAXES
INS.
TOTAL
YEAR 1:
$ 1,035.55
+
50.94
+
119.17
+
22.25
=
$ 1,227.91
YEAR 2:
$ 1,113.22
+
50.94
+
119.17
+
22.25
=
$ 1,305.58
YEAR 3:
$ 1,196.71
+
50.94
+
119.17
+
22.25
=
$ 1,389.07
YEAR 4:
$ 1,286.46
+
50.94
+
119.17
+
22.25
=
$ 1,478.82
YEAR 5:
$ 1,575.30 [3]
+
50.94
+
119.17
+
22.25
=
$ 1,575.30
TAXES AND INSURANCE WILL INCREASE FROM TIME TO TIME. INVESTOR WILL NOTIFY BUYER WHEN INCREASE IS DUE. The lease agreement, in relevant part, provided as follows: Whereas DENNIS H. SCHECHINGER, HEREINAFTER CALLED "Investor" and [petitioners] hereinafter called "Buyer" have entered into a Co-Tenancy Agreement on July 27, [sic] 1983, whereby each party is the owner of an undivided one-half interest in [Amberwood]. *194 * * * NOW, THEREFORE, Investor leases his interest in [Amberwood] to BUYER under the terms set forth in said Co-tenancy Agreement * * *. 1. The term of this lease and rental payments to be made by Buyer shall be as set forth in the Co-tenancy Agreement. * * *
On July 27, 1983, petitioners and Mr. and Mrs. Schechinger also executed the following document: BUYER is to pay payments that include Principal, Interest, Taxes, and PMI Insurance. INVESTOR to allow BUYER to deduct all Interest, Taxes, and PMI Insurance. [Relating to Amberwood.]
From July 1983 through 1986, petitioners lived at the Amberwood home, and performed needed maintenance and repairs. During 1986, petitioners made monthly payments of $ 1,461.32 to Schechinger. Also during 1986, Schechinger was making monthly payments to City Federal Savings Bank (the Bank) regarding Amberwood. (Presumably, after Schechinger foreclosed his second mortgage on Amberwood, he assumed the outstanding first mortgage held by the Bank.) A 1986 Tax and Interest Statement from the Bank (relating to Schechinger's loan obligation on Amberwood) indicates total interest paid of $ 15,419.52, with total interest accrued of *195 $ 18,692.46. The difference of $ 3,272.94 (deferred interest) was added to the 1986 beginning principal balance of $ 139,577.89, resulting in an ending balance of $ 142,850.83. The statement also reflected that $ 2,109.05 was applied to an escrow account, out of which $ 55.79 was paid for insurance and $ 1,459 was paid for taxes. [4] Accordingly, it appears that petitioners' total payments to Schechinger of $ 17,535.84 exceeded Schechinger's total payments to the Bank of $ 17,528.57 by $ 7.27. Petitioners contend that they are entitled to deduct as interest $ 15,420, representing the amount of total interest shown as paid by Schechinger to the Bank. In essence, they contend that they purchased a one-half interest in Amberwood, "subject to" Schechinger's mortgage with the Bank, and, accordingly, *196 that any interest paid by Schechinger on Amberwood was deductible by them. [5] Respondent contends that the payments to Schechinger were nothing more than monthly rental payments and, therefore, petitioners are not entitled to an interest deduction. We agree with respondent. As a preliminary matter, we note that petitioners are confused as to what taking "subject to" entails. In Stonecrest Corp. v. Commissioner, 24 T.C. 659, 666 (1955), we explained the customary meanings of "assuming" and taking property "subject to" a mortgage as follows: Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that *197 as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. This promise of the buyer can ordinarily be enforced by the mortgagee. 5 Tiffany, The Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128-16.132 (1952).
However, in the instant case, petitioners made no payments directly to the Bank. Rather, it appears that petitioners may have attempted to create what is commonly referred to as a "wraparound mortgage". As we stated in Kline v. Commissioner, T.C. Memo. 1989-317: In comparison [to a mortgage being "assumed," or taken "subject to"], a "wraparound mortgage" is an agreement under which the purchaser issues to the seller an installment obligation that includes the amount of an underlying mortgage *198 on the property as the principal amount, and the seller uses the payments under the installment obligation to service the underlying mortgage. The seller remains liable on and continues to service the underlying mortgage. Thus, a distinguishing feature of a wraparound mortgage is that payments are made to the seller, and not to an underlying mortgagee [the Bank], as is the case where a mortgage is assumed or property is taken subject to a mortgage.
We note that section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Moreover, section 1.163-1(b), Income Tax Regs., in pertinent part, provides: Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, * * * may be deducted as interest on his indebtedness.
In Amundson v. Commissioner, T.C. Memo. 1990-337, we held that this regulation reached a situation where a taxpayer acquired a one-half equitable interest in a residence when he orally agreed to assume his sister's indebtedness to a lender, and made, or caused to be made, direct payments of principal and interest to the lender. Significantly, in that *199 case, the taxpayer received a quitclaim deed (after the fact) for an undivided one-half interest in the residence (although not recorded). In the instant case, however, we have difficulty in concluding that petitioners either incurred a bona fide indebtedness or had an interest in Amberwood beyond that of a lessee. Initially, we note that petitioners did not take subject to, or assume, Schechinger's mortgage with the Bank, cf. Amundson v. Commissioner, supra, but made payments directly to Schechinger, rather than the Bank. Even within the context of a possible wraparound mortgage, however, we are unsure of the terms of petitioners' alleged loan with Schechinger. Other than the stated term of 5 years, and a purported schedule of monthly payments, nowhere in the agreements is the purchase price or any rate of interest described. Petitioners' required monthly payments, as set forth on page 3A of the cotenancy agreement, would total $ 74,486.88. This figure is roughly one-half of the agreed upon value of Amberwood. The monthly payments relate to Schechinger's obligations for principal, as well as interest, taxes, and insurance. If petitioner were purchasing *200 one-half of Amberwood for $ 72,500 (one-half of $ 145,000), it would seem that the total payout over 5 years would necessarily substantially exceed $ 74,486.88 [6] (especially taking into consideration the possibility of an increase in real estate taxes). Moreover, from all appearances, Schechinger was adding deferred interest to his principal balance. The cotenancy agreement indicates that petitioners' "one-half interest in [Amberwood] is subject to Note(s) and Deed(s) of Trust securing said property in the amount of [$ 128,700.00]". Schechinger's beginning principal balance for 1986 was $ 139,577.89; his ending principal balance was $ 142,850.83, which reflects additional negative amortization of accrued interest. Accordingly, assuming petitioners did indeed receive a one-half interest in Amberwood, the question becomes: a one-half interest in what? *201 To the extent that Amberwood remained encumbered by the first mortgage, petitioners would, in economic terms, be receiving nothing (except for a potential loan obligation, in the event Schechinger walked away from Amberwood). Thus, it is not clear what kind of interest (if any) petitioners received in Amberwood, beyond that of a lessee. We also note that no deed of trust or promissory note was submitted at trial, nor, according to petitioner's testimony, were such instruments ever executed by the parties. There is apparently nothing to prevent Schechinger from selling Amberwood and keeping all the proceeds for himself. The absence of such evidence, as well as petitioners' failure to have Schechinger testify on their behalf, suggests that any such evidence or testimony would not support their claim. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Accordingly, we hold that petitioners were, in substance, paying rent. They did not acquire any interest in Amberwood. We conclude, therefore, that petitioners are not entitled to any interest deduction regarding Amberwood for 1986. *202 In addition, since petitioners have presented no evidence regarding the $ 30 deduction for credit card interest, we hold that they have not carried their burden of proof, and we sustain respondent's disallowance thereof. 2 and 3. Amway Activities and Expenses
During 1986, petitioner worked full time as a computer programmer at Teledyne Microelectronics (Teledyne). Mrs. Swaffar also worked at Teledyne. Petitioner first became a distributor for Amway Corp. (Amway) in late 1985. [7]
Amway is a supplier of consumer products and uses a direct marketing concept to promote sales of its products. It is based on a "pyramid" incentive system where by a distributor's direct and indirect sales are rewarded with bonuses. Distributors increase their sales totals not only by sales directly to customers, but also by sales of others recruited *203 to sell Amway products. If the recruit of one distributor recruits another distributor, the sales of the new distributor also benefit the original distributor. The original Amway distributor is called an "upline" distributor in relation to his new recruit, the "downline" distributor. The upline distributor receives credit toward bonuses based on sales generated by the downline distributors in his "chain of distribution", even though he or she does not participate in effecting their sales. To maximize Amway income, the distributor must not only sell Amway products to third parties, but must recruit other individuals to be downline distributors. During 1986, petitioner purchased $ 21,546 of Amway products from his upline distributor, and sold $ 15,081 at cost to his downline distributors. (Apparently, the remaining products are accounted for by personal consumption of petitioner and his family during 1986.) Petitioner reported bonuses of $ 3,142 from his upline distributor, and commissions paid (bonuses) to his downline distributors of $ 1,671. Petitioner's downline distributors during 1986 consisted of four or five active couples. On his Schedule C, petitioner reported $ 3,142 *204 in bonuses and the following deductions relating to his Amway activity: Commissions
$ 1,671
Supplies
326
Telephone
829
Meals
1,980
Parking
37
Meetings
760
Open House
35
Tapes and books
3,452
Auto (13,360 miles)
2,806
Printing
35
Total
$ 11,931
Respondent disallowed the $ 8,789 net loss in the notice of deficiency. At trial, respondent contended for the first time that petitioner's Amway activities were not engaged in with the requisite profit objective under section 183. Such new matter requires that the burden of proof be placed on respondent. See Rule 142(a). Respondent further contends that, assuming the Amway activity was entered into with a bona fide profit objective, petitioner has failed to establish that the above expenditures were incurred and were ordinary and necessary in carrying on a trade or business, pursuant to section 162. Section 183(a) generally provides that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided by this section." The standard for determining whether an individual engaged in an activity *205 for profit, thereby enabling the deduction of appropriate expenses under section 162 or 212, is whether the taxpayer engaged in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer had the requisite profit objective. Dreicer v. Commissioner, supra.The burden of proving that such objective does not exist, as previously discussed, is on respondent. The regulations contain relevant factors for consideration in determining whether an activity is engaged in for profit. Section 1.183-2(b), Income Tax Regs., includes the following factors: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; *206 (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No one factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.
An analysis of petitioner's Amway activities requires this Court to conclude, without analyzing in depth all nine factors, that respondent has not carried her burden of showing that petitioner did not engage in the Amway activity with an actual and honest objective to make a profit. We emphasize that we do not affirmatively conclude that petitioners had a profit objective, but only that respondent has failed to prove that petitioners lacked such an objective. We next consider whether petitioner has adequately substantiated his claimed expenditures concerning the Amway activity. By disallowing a net loss of $ 8,789, we note that respondent has allowed *207 petitioner a deduction equal to his reported income, or $ 3,142. Sec. 183(b)(2). Thus, to prevail, petitioner must substantiate deductible expenditures in excess of $ 3,142. However, petitioner has only substantiated deductions for $ 2,934.69, as discussed below. Section 162(a) permits a deduction for "all the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business". Deductions are strictly a matter of legislative grace, and petitioner bears the burden of proving he is entitled to any deductions claimed on his return. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111 (1933). If a claimed deduction is not adequately substantiated, we are permitted to estimate expenses when we are convinced from the record that the taxpayer has incurred such expenses. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). However, we must have some basis upon which an estimate may be made. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Nevertheless, certain expenditures may not be estimated. Section *208 274(d) disallows certain deductions claimed under section 162 unless the taxpayer can substantiate the claim by accurate records or corroborate his own testimony as to (1) the amount of the expense, (2) the time and place of travel or entertainment, (3) the business purpose, and (4) the business relationship to the taxpayer of each person entertained. See sec. 1.274-5(b), Income Tax Regs. Among these deductions that require very specific substantiation are traveling expenses, section 274(d)(1), entertainment expenses, section 274(d)(2), and expenses pertaining to "listed property" as defined in section 280F(d)(4). Section 280F(d)(4) includes passenger automobiles and other property used for transportation. Based upon the documentation submitted and petitioner's testimony, we find that the deductions claimed for commissions, parking, meetings, open house, and printing are properly substantiated. In addition, petitioner was able to adequately substantiate $ 126.69 of $ 326 in supplies claimed. Concerning telephone costs, petitioner deducted 80 percent of the total telephone bills paid for 1986, or $ 829, based on his best estimate of calls relating to his Amway activity. Petitioner *209 had only one phone line in his home. He failed to adequately identify specific calls made which related to his Amway activity. (We note dozens of calls made to the same numbers, with the annotations "John" and "Tim"; however, petitioner was unable to recall who those individuals were.) Accordingly, without additional evidence, we sustain respondent's adjustment. Petitioner claimed $ 1,980 for meals. At trial, petitioner submitted documentation accounting for $ 1,946.60 relating to meals. Generally, petitioner testified that the meals related to tabs he would pick up regarding "one-on-one" sessions with a "prospect", and counseling sessions with his upline distributor. In addition, petitioner included receipts relating to meals purchased on the way to a product pickup, where petitioner would go to a restaurant and "basically rent the table so we could fill out the paperwork". The majority of the meals claimed allegedly related to occasions when petitioner would pick up Amway products (some of which were for his personal use), meals with petitioner's upline distributor, and meals associated with attending various Amway functions (often with large groups involved). Under the *210 strict substantiation requirements of section 274(d), the majority of petitioner's receipt and explanations do not suffice. Specifically, petitioner was unable to evince a business purpose and the business relationship to petitioner of each person entertained. By all appearances, most were generally nondeductible personal expenses. See section 262. However, those expenses specifically identified as relating to one-on-one sessions with potential prospects are allowable under sections 162 and 274(d). Accordingly, we allow petitioner $ 270 in deductible meal expenses. Petitioner deducted $ 3,452 for tapes and books. At trial, petitioner submitted a schedule detailing various books, tapes, product samples, and literature which he inventoried at the end of 1986, in the amount of $ 3,451.50. Petitioner also submitted documentation indicating that he purchased $ 5,704.51 of books and tapes from his upline distributor during 1986. Petitioner testified that he, in turn, would sell the books and tapes at his cost to his downline distributor. However, petitioner did not separately indicate the cost of purchasing the books and tapes and the income derived therefrom on his Schedule C. *211 Apparently, since the two figures were a "wash", he felt it was unnecessary to do so. We believe the amount claimed represents petitioner's ending inventory for 1986, and not a deductible expense. See section 471. Accordingly, we hold that petitioner is not entitled to the $ 3,452 deduction for books and tapes. Petitioner deducted mileage based upon 13,360 miles at 21 cents a mile, or $ 2,806. Initially, we find petitioner's mileage logs to be suspect. Petitioner recorded mileage for various one-on-one and followup sessions in his mileage log with no corresponding entry in his daily calendar. (For example, his calendar has no entries for January 3 and 7, even though he claimed mileage for those days.) Petitioner's log indicates an ending odometer reading of 77,078 on April 16, 1986; the next entry (in what appears to be a different log book) indicates a beginning odometer reading of 87,116 on April 9, 1986. In addition, petitioner included his mileage commuting from home to his primary job in the daily mileage total whenever he engaged in any Amway activity. Such mileage is not deductible. See Commissioner v. Flowers, 326 U.S. 465 (1946); secs. 1.162-2(e), *212 1.262-1(b)(5), Income Tax Regs. Moreover, a portion of the claimed mileage obviously relates to product pickups for personal use, which would not be "ordinary and necessary" under section 162. Accordingly, based upon this record, we conclude that petitioner has not carried his burden of proof in establishing that he is entitled to any mileage deduction. We therefore sustain respondent's adjustment. In sum, the amount of deductible expenditures substantiated by petitioners does not exceed the amount allowed in the notice of deficiency. Accordingly, we sustain respondent's determination on this issue. 4. Section 6653(a)(1)(A) and (B) Additions to Tax
Respondent determined additions to tax for negligence for 1986. Section 6653(a)(1)(A) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. In addition, section 6653(a)(1)(B) imposes an addition to tax of 50 percent of the interest due on that portion of underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *213 Petitioners bear the burden of showing respondent's determinations to be erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). As to the unsubstantiated Schedule C items and credit card interest, petitioner merely gave his accountant a list of the deductions he wished to claim, which included unsubstantiated business and interest expenses, nondeductible personal expenses, and inventory items. Such deductions are clearly the result of negligence. Accordingly, respondent's determination under section 6653(a)(1)(A) is sustained. However, concerning the mortgage interest issue, we hold that petitioners were not negligent. Although we have decided that petitioners are entitled to no interest deduction, we believe their error was the result of confusing language contained in the cotenancy and lease agreements (which were probably drafted by Schechinger), in addition to their lack of sophistication in a highly technical area of tax law. Accordingly, under the circumstances, a good faith misunderstanding of the agreements by petitioners does not rise to the level of negligence. Except to that extent, respondent is sustained as to the addition *214 to tax under section 6653(a)(1)(B). 5. Section 6651(a)(1) Addition to Tax
Respondent determined an addition to tax for delinquency for 1986 under section 6651(a)(1) for failure to file a Federal income tax return on or before the date prescribed. This addition to tax will not be imposed if the failure to file was due to reasonable cause and not due to willful neglect. Petitioners timely filed an application for an automatic extension of time to file their 1986 Federal income tax return on April 13, 1987. However, they incorrectly filled out the form. Instead of listing their estimated tax liability as $ 7,000 on line 1, they placed the amount of $ 40,000, the meaning of which is unclear. They correctly listed their income tax withheld as $ 7,888, intending to show no balance due, but put $ 7,000 on line 6 (for income tax balance due) and $ 0 on line 7 (for gift and generation-skipping tax to be owed). Respondent subsequently denied petitioners' application for automatic extension on May 7, 1987, for failure to pay the income tax shown as due. Thereafter, petitioners filed their 1986 return on June 29, 1987. We conclude on these facts that petitioners' failure to file *215 their income tax return on time was due to reasonable cause and not due to willful neglect. Accordingly, we hold for petitioners on this issue. 6. Section 6661(a) Addition to Tax
Respondent determined an addition to tax for substantial understatement of income tax under section 6661(a) for 1986. This addition to tax is applicable if the amount required to be shown on the return exceeds the amount actually shown on the return by the greater of (i) 10 percent of the tax required to be shown on the return, or (ii) $ 5,000. Sec. 6661(b)(1)(A). However, the amount of the understatement of tax is reduced by the portion of the understatement which is attributable to any item where there exists substantial authority for the treatment of the item, or if the facts affecting the item are adequately disclosed in the return or in the statement attached to the return. Sec. 6661(b)(2)(B). For the reasons stated above, petitioners have not established that there is any substantial authority as to deductibility, or adequate disclosure, concerning the understatement relating to mortgage interest, credit card interest, and Schedule C expenses. Accordingly, the addition to tax will apply. *216 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. It would appear that this is in error. Schechinger is the only one who would have made contributions "now or before".↩
3. This amount should probably be $ 1,382.94.↩
4. Petitioners claimed $ 1,459 on Schedule A for real estate taxes, and such amount was not disallowed in the notice of deficiency. We do not, however, consider this to be a concession by respondent but rather an oversight.↩
5. At best, it would seem then that only one-half of any interest paid could be considered to have been paid by petitioners.↩
6. $ 72,500 amortized over 5 years at 8 percent requires a total payout of $ 88,202.31, while reducing the interest to 6 percent reduces the payout to $ 84,097.68.↩
7. Although petitioner and Mrs. Swaffar apparently both worked in the Amway activity, for the sake of convenience, hereinafter we will refer to petitioner alone in discussing this issue.↩